STATE of Missouri, Respondent,

v.

Joseph WHITFIELD, Appellant.

Joseph WHITFIELD, Appellant,

v.

STATE of Missouri, Respondent.

No. 72360.

Supreme Court of Missouri,
En Banc.

July 21, 1992.

504

Melinda K. Pendergraph, Columbia, for appellant.

William L. Webster, Atty. Gen., Millie Aulbur, Asst. Atty. Gen., Jefferson City, for respondent.

BENTON, Judge.

Joe Whitfield was convicted by jury of first degree murder, first degree assault, and two counts of armed criminal action. He was sentenced to death for the murder, and to consecutive life sentences for the remaining convictions. Defendant appeals the convictions, the death penalty, and the denial of post-conviction relief. Jurisdiction is exclusive in this Court. Mo. Const. art. V, § 3. The judgment of the trial court is reversed.

On the evening of January 20, 1988, Ronald Chester, a paraplegic, and Maria Evans, while running errands, met defendant. Chester agreed to take the defendant and his five-year-old daughter home. However, once in the car, defendant asked to go to several different places.

At one location, defendant left for 30 minutes, while his daughter slept in the car. Chester and Evans eventually went to look for the child's mother but failed to find her.

Upon returning, defendant approached the car and asked for more time, eventually reappearing in five minutes. When defendant got back in Chester's car, he pulled a gun from his waistband, striking Chester and Evans in the head. A man outside the car, Varney Bolden, told defendant to shoot them both. Defendant shot Chester twice in the head and tried to shoot Evans—who used defendant's daughter as a shield.

Bolden pulled defendant from the car. Defendant shot Evans in the hand, while struggling with her. Defendant pulled his daughter from the car; Evans stayed on the floorboard pretending to be dead until she heard another car leave.

Defendant raises 26 points of error. Eight deal with jury issues (Points 11, 12, 13, 19, 20, 21, 23, and 25); two concern disclosure under Rule 25.03 (Points 3 and 4); three and one-half focus on the guilt phase (Points 5, 6, 14A, and 22); five and one-half involve the penalty phase (Points 7, 14B, 15, 16, 17, and 18); five relate to defendant's appeal of the post-conviction motion (Points 1, 2, 8, 9, and 10), and two raise "miscellaneous issues" (Points 24 and 26).

The reversal of defendant's conviction makes the post-conviction motion moot. In his eleventh, twelfth, thirteenth, and twentieth point, defendant contests the trial court's rulings on specific questions during voir dire and the strikes of specific jurors. Since each voir dire is unique, extended discussion of these issues would serve no purpose. As the remaining points may likely recur in a second trial, this Court now examines them.

### I. Discovery Issues

#### A. Rule 25.03 Violations (Point 4)

Defendant claims that the trial court erred in failing to grant a continuance, or alternatively to exclude the evidence, when the prosecutor notified the defense on the morning of trial of: three additional witnesses, two of whom testified; and one new exhibit, Evans's coat.

Rule 25.03(A) requires the State, upon timely request, to disclose the names of all witnesses the State intends to call and all

objects, within the State's control, that it intends to introduce. As the defense's request was timely filed almost nine months before trial, two questions arise. First, did the late notifications violate the rule; specifically, was the coat "within" the State's control? Second, what—if any—sanctions was the trial court required to impose under these circumstances?

■ In *State v. Robinson*, 835 S.W.2d 303, 307 (1992), this Court disapproved evasion of the duty to disclose created by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), through failure to gain possession of the discoverable evidence. This case raises similar problems with other discoverable evidence covered by Rule 25.03(A). On its face, the Rule is designed to prevent "surprise" evidence being introduced at trial. *State v. Kilgore*, 771 S.W.2d 57, 66 (Mo. banc), *cert. denied*, 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989). Failure to gain actual possession of evidence, by itself, does not justify the failure to inform the defendant of the intent to use material evidence at trial.

■ There is no dispute that the State must disclose the names of witnesses under Rule 25.03. Thus, the failure to endorse Officers Gooch and George before the morning of trial violates this requirement. If Officer Stidham had testified, the failure to endorse him before the morning of trial also would have violated the rule.

■ The second part of this issue—remedies—is thus crucial. The trial court granted minimal remedies to the defense for these violations of the rules. In general, the trial court has discretion in the sanctions imposed for failure to comply with Rule 25.03(A). *See Kilgore*, 771 S.W.2d at 66. Rule 25.16 makes sanctions permissive rather than mandatory. The trial court, however, is required to tailor the remedy to alleviate harm to the defense from the failure to disclose. "The Rules of criminal discovery are not 'mere etiquette' nor is compliance discretionary." *State v. Luton*, 795 S.W.2d 468, 477 (Mo.App.1990).

■ With regard to the last-minute endorsement of Gooch, the trial court provided a sufficient remedy—allowing the defense to talk with him before his testimony. Given the trial court's discretion, this Court finds no abuse of discretion because Gooch was not a key witness.

■ The same remedy was provided for George. The State contends that even this remedy was not required because George's report had previously been disclosed. The trial court equally attempted to remedy the failure to disclose that the coat would be offered into evidence—allowing the defense to examine the coat.

The fact that George's report had previously been disclosed does not prevent prejudice to the defense from his surprise testimony. As George was not listed as a witness, the defense attorney testified that she was not prepared to cross-examine him and was surprised by his testimony.

George, as the State's firearms expert, was a key witness who linked the gun found at defendant's home to the murder. The State argues that this Court should uphold the trial court's decision to allow the defense only to talk to George. The State points to "thorough"—albeit standard—cross-examination of George and to statements by defendant's trial counsel during the post-conviction hearing that at some point prior to trial the defense had considered (but rejected) hiring a ballistic expert to counter George's testimony. The State ignores the fact that the defense was not alerted to depose George before trial, as was done with many of the properly-disclosed witnesses. See Rule 25.12. The State also ignores that, while the defense did make preliminary plans for the possibility of George testifying, it apparently did not follow through on those plans when the State failed to endorse him. Defense counsel testified that she was unprepared for George's testimony. Defense's claim of prejudice is real. This is not a case where a firearms expert had previously been endorsed, and the witness was a substitute. *See State v. Renner*, 675 S.W.2d 463, 465 (Mo.App.1984).

■ Likewise, the coat corroborated Evans's credibility and accuracy—the center

of the defense's attack on the State's case. When the State made the last-minute decision to use the coat, the defense made two alternative requests: exclude the coat or grant a continuance. The trial court allowed the defense only a cursory inspection of the coat. This is not a case where the defense failed to request a continuance to examine the coat. *See State v. Gaskin,* 618 S.W.2d 620, 624 (Mo.1981), *vacated on other grounds,* 459 U.S. 1192, 103 S.Ct. 1171, 75 L.Ed.2d 423 (1983).

The surprise introduction of this evidence probably prejudiced defendant. The jury probably inferred that the holes in the coat were from the bullets fired during the murder of Chester, and, therefore, that Evans was at least telling the truth about bullets passing through the coat.

A thorough examination of the coat could reveal one of two possibilities. First, it could confirm that the holes, or some of them, were caused by bullets. Such a finding would give only a small benefit to the State as, without any examination, that was the logical inference, corroborating Evans's testimony. Second, an examination could prove that something else caused the holes. This finding would merely put the defense in the same position as before the sudden decision to introduce the coat into evidence. The failure of the trial court to grant a continuance means that nobody knows what created those holes.

The rules on pretrial discovery aid the truth-finding aspect of the legal system. *Cf. State v. Perkins,* 710 S.W.2d 889, 893 (Mo.App.1986). The main concern for the trial court is the fundamentally fair response to last-minute evidence. *Cf. Kilgore,* 771 S.W.2d at 66. Rules 25.03 and 25.05 clearly intend to allow both sides to know the witnesses and evidence to be introduced at trial. Rule 25.07 allows for the examination and testing of exhibits of both sides. Rule 25.12 allows the defense to depose any potential witness. Taken together, these rules are designed to prevent surprises. *State v. Sykes,* 628 S.W.2d 653, 656 (Mo.1982). True, important evidence may be discovered at the last minute. In these cases, the trial court must tailor the appropriate remedy to be fundamentally fair to each party.

In this case, the evidence was not newly discovered. Instead, the State made a last-minute decision to use the evidence before the start of the presentation of evidence. Thus, the maximum harm from a continuance would have been the need to select a new jury. Even this harm might be avoided if the defense needed only a short delay. Allowing the coat into evidence had a strong potential, under these circumstances, to mislead the jury as to the appropriate weight given the coat.

Defendant's fourth point is sustained.

### B. *Brady* Violation (Point 3)

■ Defendant contends that the State failed to deliver exculpatory evidence to the defense as required by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The alleged exculpatory evidence was a tape of a police interview of Evans, the prosecution's key witness, made the day after the murder of Chester.

This *Brady* issue has several unusual aspects. First, a *transcript* of the tape was provided to the defense. Second, the defense was allegedly given that transcript twice. The second time, however, was on the first day of trial (trial counsel having replaced the attorney who allegedly received the first copy of the transcript). Third, the defense partially used the transcript in the conduct of its case. Fourth, the police officer who conducted the interview claimed that he was unable to find the tape until practically the end of trial.

The requirements of *Brady* are designed to guarantee a fair trial and to prevent wrongful convictions. *Cf. id.* at 86–88, 83 S.Ct. at 1196–1197. The real question is whether these failings prejudiced the defense. This turns on the adequacy of the transcript as a substitute for the tape.

Defendant notes, as is his duty to this Court, that the transcript perhaps could have been introduced into evidence as a substitute for the tape. Defendant did not attempt to introduce the transcript into evidence. Rather, he used the transcript as a

basis for questions to witnesses, with the intent to impeach Evans's testimony, and to refresh the memory of other witnesses. Given that the tape contained both incriminating and exculpatory evidence, trial counsel may have had valid strategic reasons for not wanting a ruling on the admissibility of the transcript. Having chosen not to attempt to introduce the transcript into evidence, the defense made adequate use of the transcript in view of the hostility to the defense of both the questioner and the responder involved in the taped interview.

In short, any violation of *Brady* in this case was harmless error. *Cf. State v. Thompson*, 610 S.W.2d 629, 632-34 (Mo. 1981). Defendant's third point is denied.

### II. Jury Selection Issues

#### A. Individualized Voir Dire (Point 25)

■ Defendant claims error in the failure of the court to grant his motion for individualized voir dire. Both parties concede that individualized voir dire is optional, not mandatory, in capital cases. *State v. McMillin*, 783 S.W.2d 82, 94-95 (Mo. banc), *cert. denied*, — U.S. —, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990). Defendant gives no reason why the trial judge abused his discretion. Defendant's twenty-fifth point of error is denied.

#### B. Venireperson's Arrest Records (Point 19)

■ Defendant contests the state's use of arrest records to question persons on the venire. Defendant claims that this violates *§ 610.100 RSMo 1986* and *§ 610.120 RSMo 1986 & Supp.1991*. The state counters that the defendant has no standing to raise this issue on behalf of the venirepersons.

This Court noted in *State v. McMillin*, 783 S.W.2d 82,101 (Mo. banc 1990), *cert. denied*, — U.S. —, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990), that a defendant's standing to assert the rights of venirepersons is doubtful, but declined to decide the issue, finding no manifest injustice. The issue of standing is not essential to disposition of this point since there was no error in use of the arrest records.

*Section 610.100* closes arrest records when the person is not charged within 30 days of the arrest. *Section 610.120* provides that closed records are available only to "courts, administrative agencies, law enforcement agencies, and federal agencies for purposes of prosecution, litigation, sentencing, [and] parole consideration". *Section 610.110* provides that no person can be found guilty of perjury or otherwise giving a false statement for failure to acknowledge or recite an arrest which is a closed record.

In the instant case, the State gave the defense a copy of all arrest information. When questioned about prior arrests, a venireperson could elect inquiry at the bench outside the hearing of the remaining panel. The fact that a venireperson could not be prosecuted for perjury does not limit the prosecution's—or the defense's—right to ask if any person on the venire has ever been arrested. *See State v. Ruff*, 729 S.W.2d 556, 559 (Mo.App.1987) (questions about prior arrests may be used to unearth prejudice potential jurors may harbor against the state). Section 610.120 does not limit its applicability to prosecution of the arrested person. No error occurred by allowing the state to use arrest information during voir dire questioning. *State v. McMahan*, 821 S.W.2d 110, 112 (Mo.App. 1991).

#### C. Bifurcated Jury (Point 21)

■ Defendant claims that the trial court erred in allowing the same jury for the penalty phase as for the guilt phase. Defendant specifically claims prejudice because defense counsel was forced to make the strategic decision to forego questioning the venirepersons about the effect of prior homicide convictions on their decisions whether to impose the death penalty.

This Court has previously held that a bifurcated jury is not constitutionally required. *State v. Kilgore*, 771 S.W.2d 57, 63 (Mo. banc), *cert. denied*, 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989). The General Assembly has directed that the

same jury consider both guilt and punishment. *§ 565.030.2 RSMo 1986.*

Defendant's specific claim of prejudice also lacks merit. How a particular venireperson weighs and considers potential aggravating and mitigating factors does not give rise to a challenge for cause. These issues may inform the exercise of peremptory challenges. The prosecutor, however, faces the same strategic decision in questioning about mitigating factors that the defense faces on aggravating factors. Criminal procedure presents difficult decisions to both attorneys. Defendant's twenty-first point of error is denied.

### D. Care for Dependents (Point 23)

▮▮▮ Defendant alleges that the trial court erred in not providing care for family members of the potential panel, which resulted in the inability of several venirepersons—all women—to serve.

Defendant claims that the trial court had discretion to provide for such care. The General Assembly provides no clear authorization. Arguably, several statutes governing the judiciary could be interpreted to allow circuit courts to budget child care for jurors. *See, e.g., § 50.640 RSMo 1986; § 550.120.2(4) RSMo Supp.1991.* That question is not directly before this Court.

The issue is whether the Constitution requires the judiciary to take such steps. While many Missourians—particularly the poor, minorities, and women—need child care, any disparate impact on minorities by the scarcity of child care is unintentional. Government as a whole, including the judiciary, faces severe constraints on resources. The decision not to provide child care is a rational decision, facially neutral with regard to race and gender. As there is no intention to discriminate, the disproportionate impact on minorities and women is not sufficient to violate the equal protection clause of the Fourteenth Amendment, nor Article I, § 2 of the Missouri Constitution. *See Washington v. Davis,* 426 U.S. 229, 242–46, 96 S.Ct. 2040, 2049–51, 48 L.Ed.2d 597 (1976). Likewise, poverty is not a suspect class requiring strict scrutiny. *Cf. San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

Unfortunately, familial obligations prevent individuals from serving on juries. Equally, other persons cannot serve as jurors due to financial hardship. Some courts excuse students from jury duty because it interferes with school courses. *See, e.g., United States v. Fletcher,* 965 F.2d 781 (9th Cir.1992). Solutions to these problems are not, however, within this Court's jurisdiction, but rather lie within the jurisdiction of those bodies with budgetary authority. Defendant's twenty-third point of error is denied.

### III. Guilt Phase Issues

### A. Maria Evans's Drug Use (Point 5)

▮▮ Defendant alleges that the trial court erred in sustaining an objection to the cross-examination of Officer Thomas Toth about Maria Evans's drug use. Defendant claims that, by sustaining this objection, the trial court impermissibly prevented the defense from thoroughly attacking Ms. Evan's credibility and accuracy.

There was only one objection by the prosecution to the defense's cross-examination of Toth—which was that the question was "argumentative." Thus, the objection was only to the form of the question, not its substance. *See* 98 C.J.S. *Witnesses* § 328b(5) (1957). The trial court did not, at any point, prevent further questioning of Toth about Ms. Evans's drug use. Defendant's fifth point is denied.

### B. Motion to Suppress (Point 6)

▮▮ Defendant contends that the circuit court erred in not suppressing the gun found by Officer Leyshock and the statements that defendant made to Leyshock prior to being arrested.

The sole question concerning the gun is whether defendant consented to the search that produced the gun. *Cf. Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (voluntariness of consent based on totality of the circumstances). The sole question concerning the statement was whether it occurred during

custodial interrogation. *Cf. Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (not all questioning of a suspect is a custodial interrogation).

Leyshock testified regarding the circumstances of the search, including defendant's statements, at a pre-trial suppression hearing. Either right before or right after telling defendant that he was a suspect, Leyshock asked defendant "if he had been home all night." Soon thereafter, Leyshock also asked defendant's permission to look around his home, which was granted.

The trial court found that the questioning was not part of a custodial interrogation and that consent for the search was freely given. This finding of fact is not clearly erroneous. Defendant's sixth point of error is denied.

### C. Closing Arguments (Point 14A)

Defendant alleges that several of the prosecutor's statements during closing argument went outside the scope of permissible argument. These statements can be characterized into two groups: 1) statements, often preceded by phrases like "I believe," giving the prosecution's theory of the actual events that occurred in the light of conflicting and ambiguous evidence; and 2) descriptions of defendant as a killer and his victim as "a helpless paraplegic."

On the first group, defense claims that the prosecutor impermissibly personalized the evidence and vouched for its accuracy. The law draws a fine line on statements that a prosecutor can make during closing argument. A prosecutor may make statements that draw legitimate inferences from the evidence but may not make statements that imply a knowledge of facts not before the jury. *See, e.g., Grubbs v. State,* 760 S.W.2d 115, 119 (Mo. banc 1988), *cert. denied,* 490 U.S. 1085, 109 S.Ct. 2111, 104 L.Ed.2d 672 (1989). In this case, the statements by the prosecutor presented a reasonable hypothesis based on the evidence in the case.

On the second group, defense claims that the arguments were prejudicial and inflammatory. As a general rule, especially during the guilt phase, the prosecutor should refrain from *ad hominem* attacks on the defendant and other irrelevant statements that only inflame the jury. *Cf. State v. Maddox,* 658 S.W.2d 74, 76 (Mo. App.1983). Personal characteristics of the *victim,* in some circumstances, may be relevant to the sentence; and personal characteristics of the *defendant* always are relevant to the sentence. Most of the time, neither is relevant to guilt. Plain error review, however, requires that the argument had a decisive effect on the jury's determination. *State v. Newlon,* 627 S.W.2d 606, 616 (Mo. banc), *cert. denied,* 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982). The first half of defendant's fourteenth point of error is denied.

### D. Reasonable Doubt Instruction (Point 22)

Defendant alleges that the instruction on reasonable doubt unconstitutionally weakens the State's burden of proof, citing *Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). Though defendant requests reexamination of this issue, defendant's contentions present nothing new; his point is denied. *State v. Griffin,* 818 S.W.2d 278, 282 (Mo. banc 1991).

### IV. Penalty Phase Issues

### A. Admission of State's Evidence (Points 7 and 18)

Defendant objects to State's evidence during the penalty phase. In the seventh point, defendant contends that the trial court erred in denying a defense motion to exclude testimony about prior charges. In the eighteenth point, defendant seeks plain error review of the prosecution's cross-examination of defendant's brother.

In a death penalty trial, the penalty phase differs qualitatively from the guilt phase. The defendant's character and prior record are central issues of the penalty phase. *See § 565.032.1(3) RSMo Supp. 1991; cf. State v. Lingar,* 726 S.W.2d 728, 739 (Mo. banc), *cert. denied,* 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987). The jury must weigh the aggravating circum-

stances against the mitigating circumstances. In order to appropriately weigh prior convictions, the facts of those convictions may help. On the other hand, the penalty phase is not a mini-trial of these prior offenses. While both sides may explain the circumstances of prior offenses, the trial court has discretion to control this evidence. The trial court did not abuse this discretion in admitting evidence of the charges and circumstances of defendant's prior convictions. Defendant's seventh point of error is denied.

Defendant seeks plain error review, under Rule 30.20, of the cross-examination of his brother, Nathan Whitfield, during the penalty phase, in two particular areas. First, whether any other members of defendant's family were "career criminals"? The State may introduce evidence attacking the defendant's mitigating circumstances. Defendant invoked his abusive family background and environment as a mitigating circumstance. The State could legitimately attack that circumstance by showing that the defendant was the only member of the family with a lengthy criminal record.

The second line of questioning concerned an incident in which defendant shot—perhaps accidently—one of his brothers. The State contends that this evidence was impeachment of the defendant's claimed mitigating circumstance of his relationship with his family. The State is not required to give notice of impeachment of a mitigating circumstance. On this record, this Court cannot characterize the failure of the trial court to sua sponte strike this testimony as plain error. Defendant's eighteenth point of error is denied.

### B. Exclusion of Defense Evidence (Point 17)

Defendant asserts that the trial court erred in sustaining objections to two lines of inquiry on direct examination during the penalty phase. Defendant alleges that both inquiries would have produced mitigating evidence. However, no offer of proof was made.

First, the State objected to defense questioning of defendant's brother about their father's arrest record. Defendant claims that this question, and any follow-up questions, would disclose their father's mental illness and propensity for violence. This evidence would illustrate the environment where the defendant was raised. The State claims, because other witnesses testified in detail about the defendant's father's various problems, no prejudice resulted.

Second, the State objected when the defense questioned another brother about the context of one of defendant's felonies alleged as an aggravating circumstance. The State claims that this information about another felony was not a mitigating circumstance, and, even if it were, the trial court has discretion to exclude such evidence.

In most circumstances, the trial court does have discretion to determine relevancy. *State v. Brown*, 718 S.W.2d 493 (Mo. banc 1986). The United States Supreme Court has ruled that there is an exception to this discretion during the penalty phase of a capital offense. The defendant is allowed to introduce *any* evidence that may mitigate the penalty imposed. *Penry v. Lynaugh*, 492 U.S. 302, 317–19, 109 S.Ct. 2934, 2946–47, 106 L.Ed.2d 256 (1989). A defendant's prior record is an aggravating factor that the jury weighs to decide the appropriate penalty. Logically, any evidence explaining that prior record is mitigating evidence even if it may not technically be a mitigating circumstance itself.

Both parties, however, ignored the actual objection made to this evidence. The defense asked Michael Whitfield, "[A]re you aware of any incident that led up to your brother killing Donnell Porter?" The State's objection was that the question required hearsay. The question itself does not indicate whether the defendant's brother had actual knowledge or was relaying information from others. The general rule is that, absent an offer of proof, an error is not preserved. *See Frank v. Environmental Sanitation Management, Inc.*, 687 S.W.2d 876, 883–84 (Mo. banc 1985). The exceptions excusing an offer of proof do

not apply on the present record. It is not obvious that the answer would or would not have been hearsay. It is not clear that the trial court erred in excluding the testimony on the ground that it was hearsay. Any error does not rise to the level of plain error. Defendant's seventeenth point is denied.

### C. Closing Arguments (Point 14B)

Defendant contends that the prosecutor's closing argument during the penalty phase exceeded permissible argument in at least seven different ways.

 First, the prosecutor referred to defendant as a "mass murderer" four times and as a "serial killer" three times dispersed throughout the opening part of the closing argument. Defendant contends that these statements distort the evidence and are prejudicial. The common sense meaning of those terms forces this Court to agree. Defendant's two prior homicides occurred almost 20 years before the current homicide, and were not similar (the first—a manslaughter conviction—involved a gun that went off "accidentally" after defendant hit the victim with it; the second—a second degree murder conviction—occurred as part of a robbery). The evidence before the trial court does not demonstrate that defendant was either a mass murderer or a serial killer.

 The terms "mass murderer" and "serial killer" are pejorative names associated with a small ghoulish class of homicidal sociopaths who repeatedly and cruelly murder for no apparent motive than to satisfy a perverse desire to kill or cause pain. No evidence suggests that the defendant's prior homicides were of this character. The use of these words is name calling designed to inflame passions of jurors. Comments designed solely to inflame jurors against the defendant by associating him with heinous crimes not in the record is always error, although not always reversible error. Because this case is reversed on other grounds, this Court need not determine the prejudice here. The argument was error, the objection should have been sustained; and, on retrial, the State must avoid such argument.

Second, defendant objects to the prosecution's comment on the defendant's laughing during some of the testimony. The State correctly notes that this referenced defendant's laughing during a humorous incident that several jurors also found funny. The comment occurred as part of an argument that the jury should ignore the defendant's appearance, and was not—as the defense alleges—a reference to defendant's failure to testify.

 Third, defendant alleges the prosecution inaccurately introduced potential future dangerousness. The prosecutor's arguments could refer to defendant's potential dangerousness either to other inmates or to the public, on the remote chance of release. As the evidence does not indicate any past failure to adjust to incarceration, the only permissible argument is a reference to the danger if he were released. *Cf. State v. Antwine*, 743 S.W.2d 51, 71 (Mo. banc 1987), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988).

The remaining four objections were not preserved at trial; defendant seeks plain error review. In these four statements, the prosecutor: 1) asked the jury to recognize that the defendant, regardless of his appearance, was not like them; 2) noted that, if the jury had believed defense counsel, defendant would already be freed; 3) vaguely and loosely referred to Scripture with a reference to people with problems who "can live at the foot of the cross and do the best they can with what God gave them"; and 4) stated that this case was an appropriate case for the death penalty. While the second and third statements are troubling, they are not plain error. The other two statements appear acceptable in the closing argument of the penalty phase.

The second half of defendant's fourteenth point is sustained as to the first allegedly improper argument and denied as to the other allegedly improper arguments.

### D. Aggravating Circumstances Instruction (Point 15)

 Defendant asserts the trial court erred by submitting three prior con-

victions as separate statutory aggravating circumstances, and by only requiring the jury to find that the defendant had those convictions—rather than requiring the jury to also find that those convictions were "serious assaultive criminal convictions."

Whether a conviction is a serious assault is a matter of law. *See, e.g., State v. Smith*, 781 S.W.2d 761, 769 (Mo. banc 1989), *vacated and remanded on other grounds*, 495 U.S. 916, 110 S.Ct. 1944, 109 L.Ed.2d 306, *reaff'd*, 790 S.W.2d 241 (Mo. banc), *cert. denied*, —— U.S. ——, 111 S.Ct. 443, 112 L.Ed.2d 426 (1990). The jury only finds as a matter of fact that (at least one of) these prior convictions actually occurred.

■ Likewise, based on *§ 565.032.2(1) RSMo 1986 & Supp.1991*, the prior convictions could be calculated as one, rather than three, aggravating circumstances. The current instruction favors the defendant by requiring unanimity on each conviction. The logical alternative would require unanimity only to the fact that defendant was convicted for crime X, crime Y, and/or crime Z. Despite defendant's contention, his criminal record possesses the same weight as an aggravating circumstance whether it is described as one circumstance or multiple circumstances.

Defendant's fifteenth point of error is denied.

### E. Mitigating Circumstances Instruction (Point 16)

■ Defendant contends that the trial court erred in refusing to instruct the jury on nonstatutory mitigating circumstances, and in instructing the jury that it "may consider" mitigating circumstances found from the evidence—rather than instructing the jury that it *must* consider such mitigating circumstances. These two arguments have been presented and rejected in prior cases. *See, e.g., State v. Petary*, 781 S.W.2d 534, 543 (Mo. banc 1989), *vacated and remanded on other grounds*, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 *reaff'd*, 790 S.W.2d 243 (Mo. banc), *cert. denied*, —— U.S. ——, 111 S.Ct. 443, 112 L.Ed.2d 426 (1990); *State v. Young*, 701

S.W.2d 429, 436–37 (Mo. banc 1985). Defendant's sixteenth point of error is denied.

### V. Miscellaneous Issues

### A. The Right to Allocution (Point 24)

■ Defendant claims denial of his right of allocution. Rule 29.07(b)(1) recognizes a defendant's right to address the court before imposition of judgment and sentence. Despite defendant's claim to the contrary, the right of allocution in Missouri does not extend to addressing the jury. Defendant's twenty-fourth point is denied.

### B. Constitutionality of Missouri's Death Penalty (Point 26)

Defendant contends that the current system of capital punishment is unconstitutional in three ways: 1) it violates the prohibition on cruel and unusual punishment and lacks a rational basis; 2) there is unfettered prosecutorial discretion; 3) this Court is unwilling to conduct the thorough proportionality review mandated by statute.

Each attack focuses on the exceedingly complex system mandated by the combined acts of the General Assembly and the United States Supreme Court. The current system derives from the General Assembly's desire to structure a system that meets the requirements of *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Subsequently, the United States Supreme Court added other requirements. The result is that states face the apparent dilemma of creating narrow discretion in the sentencer to impose the death penalty, but broad discretion to impose a life sentence. *Walton v. Arizona*, 497 U.S. 639, ——, 110 S.Ct. 3047, 3058–68, 111 L.Ed.2d 511 (1990) (Scalia, J., concurring); *Penry v. Lynaugh* 492 U.S. 302, 327, 109 S.Ct. 2934, 2951, 106 L.Ed.2d 256 (1989).

■ Currently, the United States Supreme Court holds that a death penalty statute that structures the sentencing decision meets the requirements of the Eighth Amendment's prohibition on cruel and unusual punishment. *Penry*, 492 U.S. at 326–27, 109 S.Ct. at 2950–51. Missouri's cur-

rent system meets those requirements. The jury can impose the death penalty only under certain conditions. First, it must find at least one statutory aggravating circumstance, and must be unanimous on each aggravating circumstance, whether statutory or nonstatutory. § 565.030.4(1) RSMo 1986; § 565.032.2 RSMo Supp.1991. Second, the jury must unanimously find that all aggravating circumstances, taken together, sufficiently warrant imposing the death penalty. § 565.030.4(2) RSMo 1986. This requirement is a finding of fact by the jury, not a discretionary decision. Third, the jury must unanimously find that mitigating circumstances weigh less than aggravating circumstances. The jury need not be unanimous as to any particular mitigating circumstance. § 565.030.4(3) RSMo 1986. The jury does not make any discretionary decision in imposing the death penalty. On the other hand, the jury is given the constitutionally-required unlimited discretion to exercise mercy and reduce the sentence to life. § 565.030.4(4) RSMo 1986. Therefore, the current system in Missouri fully complies with the dictates of the Eighth Amendment.

This Court previously held that this statute complies with Article I, § 21 of the Missouri Constitution. *State v. Newlon*, 627 S.W.2d 606, 612–13 (Mo. banc), *cert. denied*, 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982). Defendant's argument does not require reexamination of *Newlon*. Defendant also claims that no rational basis exists for the death penalty itself. The wisdom of the death penalty is for the General Assembly, not this Court.

Defense also argues that nothing in the statutes dictates when the prosecution may waive the death penalty. This Court has previously rejected this attack on the death penalty statutes. *State v. McMillin*, 783 S.W.2d 82, 101–02 (Mo. banc 1990). The entire criminal justice system rests on apparent prosecutorial discretion in choosing whether to file charges, what charges to file, and whether to accept a plea bargain. *Cf. State v. Smith*, 422 S.W.2d 50, 66–67 (Mo. banc 1967), *cert. denied*, 393 U.S. 895, 89 S.Ct. 150, 21 L.Ed.2d 176 (1968).

The remaining claim alleges that this Court is not completely conducting a proportionality review. Specifically, this Court does not compare death-penalty cases to cases where the death penalty was not sought—such as where the death penalty was waived or the offense of conviction was less than first degree murder. By definition, a conviction for second degree murder cannot be compared to one for first degree murder. The General Assembly has declared that the death penalty is not appropriate for second degree murder.

A different problem occurs where the death penalty is waived. In conducting proportionality review, this Court must compare each case to similar cases. § 565.035.3(3) RSMo 1986. To fulfill this statutory duty, this Court needs proven facts. When the death penalty is submitted to the jury, it finds facts as to aggravating circumstances. When the death penalty is waived, no factual hearing occurs; no facts are proven. In requiring proportionality review, the General Assembly gave this Court the duty to build a record of death penalty cases. § 565.035.6 RSMo 1986. For the past 15 years, this Court has fulfilled that duty and compiled an extensive data base, which shows that no one fact independently controls whether an individual gets the death penalty. Each defendant is unique. Because mandated by the General Assembly, this Court will continue to examine and reexamine jury decisions to see if a consensus forms that particular circumstances make the death penalty inappropriate.

Defendant's twenty-sixth point of error is denied.

The judgment of the trial court is reversed; this case is remanded for a new trial consistent with this opinion. The appeal from the judgment on defendant's post-conviction motion is dismissed as moot.

ROBERTSON, C.J., COVINGTON, HOLSTEIN, THOMAS and PRICE, JJ., and FLANIGAN, Special Judge, concur.