For the reasons stated above, we affirm.

All concur.

**STATE of Missouri, Respondent,**

v.

**Mark Blane EIGHINGER, Appellant.**

**No. WD 50081.**

Missouri Court of Appeals,
Western District.

Aug. 13, 1996.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 1, 1996.

Application to Transfer Denied
Nov. 19, 1996.

Patrick J. Berrigan, Assistant Public Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Joanne E. Joiner, Assistant Attorney General, Jefferson City, for respondent.

Before FENNER, C.J., P.J., and HANNA and LAURA DENVIR STITH, JJ.

LAURA DENVIR STITH, Judge.

Mark B. Eighinger appeals from a jury verdict finding him guilty of second degree murder of his step-daughter, sixteen year-old Courtney Waring. § 565.021. He alleges that the trial court erred in permitting the State to introduce evidence of his statement at the time of his confession that he desired to pay for his offense with his life, because it was inadmissible lay opinion evidence. He also argues that the trial court erred in failing to declare a mistrial after it sustained his objection to a question by the State which he believes erroneously implied that he had sexually molested Courtney, as this was evidence of other crimes. We find neither ruling constituted reversible error, and affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mr. Eighinger married Judy Waring on May 2, 1992, after a five month courtship. After the marriage, Mr. and Mrs. Eighinger, along with Mrs. Eighinger's daughter from a previous marriage, Courtney Waring, moved to a house in Kearney, Missouri.

From the outset of the marriage the relationship between Courtney and her new step-father was strained. As is true of many children in similar circumstances, Courtney was angered by the disruptions that resulted from her parents' divorce and her mother's subsequent remarriage. She particularly re-

sented the fact that as a result of the remarriage she had to move away from her friends and change high schools. She blamed Mr. Eighinger for imposing those changes on her. Courtney argued often with her step-father and told her mother that she hated him.

Although Mr. Eighinger wanted Courtney to call him Dad, he was not fond of her either. In fact, shortly after the marriage he told his new wife that he did not want Courtney to live with them. He believed that Courtney was spoiled, foul-mouthed and disrespectful, and he disapproved of the fact that she dated older men. On one occasion, having overheard Courtney and her mother talking about him, Mr. Eighinger entered Courtney's bedroom and threw Courtney against the wall. He then put his hands around Courtney's neck before throwing her on the bed.

The latter incident and the constant bickering between Mr. Eighinger and Courtney so affected the young marriage that Mr. and Mrs. Eighinger separated at least three times. On July 7, 1993, Mr. Eighinger told his wife that she must choose to live with either Courtney or him. She asked him to return his house keys and he reluctantly did so. The Eighingers then separated for the final time.

On July, 17, 1993, Mr. Eighinger went to his wife's place of employment and borrowed her house keys so that he could return to the house to retrieve some tools he had left there. When she gave him the house keys, she informed him that Courtney was home taking a nap.

When Mrs. Eighinger returned home from work the evening of July 17, 1993, she could not find Courtney, but noticed that Courtney's television and fan were on. The next day, Mr. Eighinger persuaded his wife to rent a carpet cleaner, saying that he had noticed a pet odor in the house. When Mrs. Eighinger returned home from work on July 18, 1993, and found Courtney still missing, she called the police. Although she was clearly concerned for Courtney's safety, Mr.

Eighinger told her that Courtney would "turn up." Mr. Eighinger then participated in the ensuing search.

About two weeks after the killing, Mr. Eighinger, unable to convince the police of his innocence, voluntarily confessed to killing Courtney and signed a written statement recounting the events of July 17. According to Mr. Eighinger's statement, once in the house, he encountered Courtney when he opened her bedroom door to see if she was home. Courtney became angered by this intrusion and shouted at him. He then walked to the garage to collect his tools and she followed him, continuing to swear at him. The argument intensified and he tried to grab her but she escaped and ran to her bedroom.

Mr. Eighinger followed Courtney, grabbed her by the neck and choked her with his hands until she died. He then wrapped Courtney's body in a sheet, placed it in the back of his truck and began to mow the grass to collect his thoughts. Mr. Eighinger later returned the house keys to his wife while Courtney's body was still in the back of his truck. Afterwards, he drove to the Chouteau Bridge, removed Courtney's clothes to make it appear as though she had been raped, weighted her nude body down with rocks and dropped her into the Missouri River. He told police that he did not rape or sexually abuse Courtney, however. The next day he used the carpet cleaner to clean up blood stains in Courtney's room. Mr. Eighinger also said in his written statement "I want the appropriate persons to know that I have taken the life of Courtney Waring and desire to pay for this offense in the same manner; that is a life for a life, nothing less."

Even after admitting his role in Courtney's death, Mr. Eighinger refused to reveal where he had disposed of Courtney's body. In February 1994, however, a farmer, whose land had been flooded by the Missouri River in 1993, discovered a human skull on his property. The skull was later identified as that of Courtney Waring.[1]

---

1. Mr. Nigro, a fellow inmate of Mr. Eighinger, testified that Mr. Eighinger told him in prison that he borrowed scuba-diving gear and disposed of Courtney's body by placing it in a crevice

approximately 30 feet below the surface of the Missouri River. Mr. Nigro further testified that Mr. Eighinger had drawn a map of where he had disposed of the body. Aware that the authorities

Mr. Eighinger was charged by information on November 1, 1993, with murder in the first degree under § 565.020, RSMo 1986. The State did not seek the death penalty. Thereafter, upon a motion by the defense, venue was changed from Clay to Platte County. Trial was held from July 25 through July 28, 1994. Mr. Eighinger did not present any evidence in his defense. The jury returned a verdict of guilty on the lesser included offense of second degree murder and recommended a life sentence. On September 16, 1994, Mr. Eighinger was sentenced to life imprisonment. He subsequently filed a timely notice of appeal. No postconviction motions under Rule 29.15 have been filed.

## II. THE TRIAL COURT DID NOT COMMIT REVERSIBLE ERROR IN ADMITTING THE PORTION OF MR. EIGHINGER'S CONFESSION IN WHICH HE STATED HE BELIEVED HE DESERVED TO DIE

Mr. Eighinger first alleges that the trial court erred in overruling his motion in limine to exclude from evidence the portion of his statement in which he expressed his "desire to pay for this offense in the same manner; that is a life for a life, nothing less." This portion of the statement, he contends, was irrelevant and greatly prejudiced him by inviting the jury to assess punishment in accordance with his expressed wishes. Mr. Eighinger further contends in his brief that this portion of the statement constituted inadmissible opinion evidence because "it was nothing but an irrelevant opinion by a lay person on a matter that was an ultimate issue for this jury, the matter of punishment."

■ Mr. Eighinger's contention on this point does not require reversal. First, it was Mr. Eighinger himself who introduced the portion of his confession in which he stated that he believed he should pay for his crime in the same manner as did Courtney, with his life "nothing less." Defendant suggests on appeal that he nonetheless should be able to appeal admission of this statement. In support, he points out that he had previously

filed a motion in limine to exclude the statement, which had been denied, and that he had again moved to exclude the statement at trial, and his motion again had been denied. He suggests that in this type of situation, he was entitled to admit the statement himself and then raise the denial of his motion to exclude the statement as error on appeal.

■ While we appreciate the difficult position in which counsel was placed by the trial court's denial of his motions to exclude this evidence, Missouri law is settled that a party may not complain about evidence introduced into the case through his attorney's questions or conduct. State v. Idlebird, 896 S.W.2d 656, 663 (Mo.App.1995); State v. Middleton, 854 S.W.2d 504, 516 (Mo.App.1993). It was reasonable trial strategy for defense counsel to attempt to take the sting out of his client's confession by admitting it in evidence himself, and by showing his contrition for his act. This may well have had the intended effect, and been partially responsible for the jury's determination to convict Mr. Eighinger of second rather than first degree murder. Mr. Eighinger may not now complain that it was error to admit the very evidence he chose to introduce.

Second, the only basis on which Mr. Eighinger now objects to admission of the statement is that it constitutes improper lay opinion evidence. Mr. Eighinger did not raise this objection in the trial court, however. He therefore has not preserved it for appeal. State v. Foster, 854 S.W.2d 1, 5 (Mo.App. 1993). At the time of trial, Mr. Eighinger only objected that the statement was irrelevant and unduly prejudicial. He does not raise these objections on appeal. He thus has preserved none of these objections for appeal. Id.

■ In any event, we would not find any of these three objections meritorious. As Mr. Eighinger correctly points out, opinion testimony is admissible only if the jury, from want of experience or knowledge, is unable to draw a proper conclusion without such assistance. State v. Boyd, 706 S.W.2d 461, 465 (Mo.App.1986). Here, however, Mr. Eigh-

had not located Courtney's body, Mr. Nigro saved the map and reported Mr. Eighinger's statements to the police. Mr. Eighinger's fingerprint was later found on the map.

inger did not purport to offer an expert or lay opinion as to the punishment which should be assessed against him by a jury in a court of law. He was clearly and directly stating his personal opinion as to the wrongness of his conduct and his moral culpability—in other words, the statement showed his consciousness of guilt and his remorse. Conduct and statements of a defendant occurring after the commission of a crime which are relevant to show a consciousness of guilt are generally admissible. *State v. Cook,* 711 S.W.2d 208, 210 (Mo.App.1986).

There is also no evidence that, despite its relevance, the statement was unduly prejudicial. What Mr. Eighinger said in his statement was that he desired to pay for this offense in the same manner as Courtney had paid, that is, with his life. Yet, the State did not even seek the death penalty, so death was not a punishment option available to the jury. While Mr. Eighinger suggests that the jury might nonetheless have used the statement as a basis to increase punishment, he points to nothing in the record which indicates that this occurred. The prosecutor did not argue that his punishment should be increased because of his statement that he deserved the same fate as Courtney, nor did he even refer to this portion of the statement in his closing argument. While the jury did recommend a life sentence, it acquitted Mr. Eighinger of first degree murder, the most serious charge available to it. In these circumstances, admission of the statement did not constitute reversible error.

### III. *THE PROSECUTOR'S QUESTION REGARDING A SEXUAL ENCOUNTER WAS NOT REVERSIBLE ERROR*

Mr. Eighinger next contends that the trial court erred in overruling his motion for mistrial during the testimony of an FBI agent. The prosecutor asked the agent whether he had ever asked Mr. Eighinger about a "sexual encounter" with Courtney. Mr. Eighinger argues here that such an inquiry was improper in that it injected evidence of uncharged crimes and that the trial court's instruction to disregard did not cure the resulting prejudicial effect.

The question and the subsequent exchange of counsel were as follows:

[PROSECUTOR]: At any time during the questioning that evening on August 3rd, 1993, did you ask him about [a] sexual encounter with Courtney Waring?

[DEFENSE]: Judge, I'm going to object. May we approach the bench?

[THE COURT]: Yes.

(Counsel approached bench:)

[DEFENSE]: There's no evidence of any sexual encounter with Courtney Waring in this case. I strenuously object to the insinuation that there was. There's been no evidence of any sexual encounter. This evidence is being sought strictly to prejudice the Defendant and inflame the passion of the jury. It has nothing to do with this alleged offense of murder. It's improper. It violates his due process rights under the ... Constitution, a right to be charged for the crime for which he is on trial.

[PROSECUTOR]: My response is that in the confession, Mark Eighinger tells Agent Napier that he didn't rape Courtney Waring. I'm going to ask him who brought the subject up.

[DEFENSE]: What difference does that make? There's no allegation that he raped Courtney Waring, and they're suggesting that he did.

[PROSECUTOR]: My response is it's in the confession. What difference it makes is it's his confession, he brings up the topic. My response is that it's in the confession. I believe it's relevant.

[DEFENSE]: It's in the confession he did not rape Courtney Waring.

. . . .

[THE COURT]: Objection sustained.

[DEFENSE]: Judge, I'd like the jury— first of all I'll move for a mistrial based on the last question of the prosecuting attorney for the reasons I stated at the bench in my objection.

[THE COURT]: Overruled.

[DEFENSE]: Could I have a cautionary instruction to the jury to disregard the last question of the prosecutor not to

speculate on any answer that the witness may have given?

(In open court)

[THE COURT]: The jury will disregard the last question and not speculate as to what answer might have been given. Proceed.

■ As noted, the objection to this question at trial and on appeal was that it charges Mr. Eighinger with a crime other than the one for which he is on trial. Both parties acknowledge that defendants in criminal cases have the "right to be tried only for the offense for which they are charged." *State v. Hornbuckle,* 769 S.W.2d 89, 96 (Mo. banc), *cert. denied,* 493 U.S. 860, 110 S.Ct. 171, 107 L.Ed.2d 128 (1989). There is a danger that the jury will convict the defendant because it believes he has a propensity to commit such crimes, rather than based on the evidence in the case before the court, if evidence of other crimes is admitted. It is for this reason that as a general rule it is error to admit evidence which "shows that the defendant has committed, been accused of, been convicted of or definitely associated with another crime or crimes." *Id.*

■ As the Supreme Court noted in *State v. Bernard,* 849 S.W.2d 10, 13 (Mo. banc 1993), however, evidence of other uncharged crimes is admissible "if the evidence is logically relevant, in that it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial, ... and if the evidence is legally relevant, in that its probative value outweighs its prejudicial effect."

■ *Bernard* noted that there are five commonly recognized situations in which such evidence can be admitted based on its logical and legal relevance. These include use of such evidence to establish (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan, or (5) the identity of the accused. *Id.* In addition, *Bernard* recognized that "[e]vidence of prior misconduct that does not fall within one of the five enumerated exceptions may nevertheless be admissible if the evidence is logically and legally relevant." *Id.*

■ Defendant argues that the question does not fit within any of these exceptions and was not logically and legally relevant, and therefore was inadmissible as evidence of other crimes. We need not determine this issue, for we disagree with defendant's initial premise that the question sought to elicit or constituted evidence of other crimes.

There is no evidence that Courtney was sexually assaulted by defendant or anyone else. In context, it is evident that the State did not ask the above question in an attempt to show otherwise at trial. Rather, prior to the above exchange, a defense witness read to the jury the written confession which defendant had given the police. In that confession, he specifically stated that he had removed Courtney's clothes in an effort to make it appear that she had been raped. He also specifically stated "I did not rape Courtney or sexually abuse her. Those actions never occurred to me."

Later, the FBI agent to whom defendant confessed took the stand. The prosecutor went over the confession in detail, and repeatedly asked the witness whether he had asked Mr. Eighinger about various matters at the time of Mr. Eighinger's statement. It was during the course of this questioning that he asked if the agent had asked Mr. Eighinger about a sexual encounter with Courtney. Apparently, this was intended to elicit the answer that it was Mr. Eighinger who had brought up the issue of removing Courtney's clothes as part of his effort to conceal his involvement in the crime by creating an inference that her death occurred as a result of a rape by a third party.

We agree with defendant that the question was inartful and objectionable. However, it was not asked in bad faith. The purpose of the question was to obtain testimony concerning the manner in which the crime and the confession occurred, and to show an attempt to conceal the crime. Moreover, after the court sustained defense counsel's objection and told the jury to disregard the question, the prosecutor went on to ask the agent about his disposal of the body and Mr. Eighinger's admission that he had confessed to removing Courtney's clothes so as to make it appear she had been raped and murdered.

We believe this put the question in its proper context.

■■■ As a result, we do not believe that the trial court erred in refusing to grant a mistrial. In so holding, we reject defendant's contention that such instructions are inherently ineffective. While all members of the bar do not agree concerning the effectiveness of instructions to disregard, Missouri law is well-settled that it is normally within the trial court's discretion to determine whether such instructions are adequate to cure any prejudice, or whether a mistrial is required. *State v. McCrary,* 900 S.W.2d 227, 233 (Mo.App.1995); *State v. Bolanos,* 743 S.W.2d 442, 449 (Mo.App.1987); *State v. Laws,* 668 S.W.2d 234, 238 (Mo.App.1984); *State v. Charles,* 542 S.W.2d 606, 610–11 (Mo.App.1976). Where, as here, the trial court has refused to grant a mistrial, we thus review its decision only for abuse of discretion. *State v. Young,* 701 S.W.2d 429, 434 (Mo. banc 1985), *cert. denied,* 476 U.S. 1109, 106 S.Ct. 1959, 90 L.Ed.2d 367 (1986).

In deciding whether the trial court has abused its discretion, we are guided by the principle that a mistrial is a "drastic remedy" which should be "employed sparingly." *State v. Wren,* 643 S.W.2d 800, 802 (Mo. banc 1983). The jury had already heard defendant's explanation in his confession as to why he removed the victim's clothes. Subsequent questioning by the prosecutor also placed his question in context. The prosecutor did not refer to any alleged "sexual encounter" either in closing argument or otherwise. In light of these facts and considering the strength of the other evidence in the case, we defer to the trial court's discretion that any prejudice resulting from the improper question was cured by the court's instruction. For these reasons, we do not find that the court abused its discretion in refusing to grant a mistrial.

## IV. *THE COURT DID NOT ERR IN DENYING THE MOTION TO PAY FOR THE CARE OF DEPENDENT CHILDREN AND FAMILY MEMBERS OF SINGLE PARENTS SELECTED AS JURORS*

■■ Because the jurors in this trial were to be sequestered, defense counsel filed a Motion for the Court to Pay for the Care of Dependant Children and Family Members of Single Parents Who Are Selected as Jurors. The trial court denied the motion. The court later excused three married women from the venire based upon their showing that each of them had young children to care for and would suffer undue hardship by having to serve on a sequestered jury. Excusal on this basis is authorized by Section 494.430 RSMo 1994, which states in relevant part:

> Upon timely application to the court, the following persons shall be excused from service as a petit or grand juror: ...
>
> (4) Any person upon whom service as a juror would in the judgment of the court impose extreme hardship; ...

§ 494.430(4). The Missouri Supreme Court has specifically noted that a trial court has substantial discretion with regard to juror excusals. *State v. Murray,* 744 S.W.2d 762, 770 (Mo. banc), *cert. denied,* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988) (interpreting prior similar version of statute). *See also State v. Leisure,* 838 S.W.2d 49, 56 (Mo.App.1992).

Defense counsel recognizes that Section 494.430(4) permits jurors to be excused based on hardship, but argues that the need to care for children as a basis for a hardship excusal will predominately impact women, and thus violates his right to a jury selected from a fair cross-section of the community. He further suggests that the resulting disproportionate exclusion of women as potential jurors violates the Equal Protection Clause, for women are members of a recognized minority group, citing *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (race-based exclusion of potential jurors is unconstitutional), and *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (gender-based exclusion of potential jurors is unconstitutional). He finally asserts that the Equal Protection Clause was violated because the strikes were based on the financial situation of the excused venirepersons. He does not suggest that the trial court should have forced these women to serve and to leave their children at home unsupervised. Rather, he suggests

that the trial court should have granted his motion to pay for child care for these women, and that its failure to do so violated the constitutional rights noted above.

■ First, we note that the three women who were excluded because of their need to care for their children were all married women. Defendant's motion requested child care be provided only for single parents selected as jurors. Thus, even had his motion been granted, no child care would have been provided to these women. Denial of the motion therefore could not have prejudiced defendant.

■ In any event, in *State v. Whitfield*, 837 S.W.2d 503 (Mo. banc 1992), the Missouri Supreme Court specifically rejected the argument raised here, that denial of child care to jurors violates equal protection of the laws based on either gender or poverty. In so ruling, the Court stated:

> While many Missourians—particularly the poor, minorities, and women—need child care, any disparate impact on minorities by the scarcity of child care is unintentional. Government as a whole, including the judiciary, faces severe constraints on resources. The decision not to provide child support is a rational decision, facially neutral with regard to race and gender. As there is no intention to discriminate, the disproportionate impact on minorities and women is not sufficient to violate the equal protection clause of the Fourteenth Amendment nor Article I, § 2 of the Missouri Constitution. Likewise, poverty is not a suspect class requiring strict scrutiny. . . .

837 S.W.2d at 510 (Citation omitted).

Here, as in *Whitfield*, there is no evidence indicating that the excused venirepersons were intentionally discriminated against based upon their gender.[2] Moreover, in *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the Supreme Court recognized that the mere fact that exclusion based on the need to care for minor children

may have a disproportionate impact on women does not in itself provide proof of such intentional discrimination.

*Duren* held that Missouri's automatic statutory exemption of women from jury service upon their request did violate defendant's rights as guaranteed by the Sixth and Fourteenth Amendments because it failed to ensure that jurors in criminal cases be drawn from a fair cross-section of the community. In so holding, however, the Court distinguished the case before it from a case, such as this one, in which a statutory basis of exclusion is a reasonable one even though it may inevitably be over-inclusive or have a disproportionate impact on women, stating:

> We recognize that a State may have an important interest in assuring that those members of the family responsible for the care of children are available to do so. . . . We stress, however, that the constitutional guarantee to a jury drawn from a fair cross section of the community requires that States exercise proper caution in exempting broad categories of persons from jury service. Although most occupational and other reasonable exemptions may inevitably involve some degree of over-inclusiveness or under-inclusiveness, any category expressly limited to a group in the community of sufficient magnitude and distinctiveness so as to be within the fair-cross-section requirement—such as women—runs the danger of resulting in under-representation. . . .

*Duren*, 439 U.S. at 370, 99 S.Ct. at 671.

This understanding of *Duren* is reinforced by the United States Supreme Court's later decision in *J.E.B., supra*. In that case, involving the exclusion of female jurors by use of peremptory strikes, the Court wrote that "[e]ven strikes based on characteristics that are disproportionately associated with one gender could be appropriate, absent a showing of pretext." 511 U.S. at ——, 114 S.Ct. at 1429. The Court went on to explain that "while challenging all persons employed as

---

2. Appellant cites no authority for the proposition that exclusion based on poverty provides a basis for finding an equal protection violation. As noted in *Whitfield*, poverty has not been found to be a suspect class requiring strict scrutiny. *State v. Whitfield*, 837 S.W.2d at 510. *Cf. San Antonio Independent Sch. Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). This point will therefore not be addressed further.

nurses would disproportionately affect women[,]" such challenges "may well not be unconstitutional, since they are not gender- or race-based." 511 U.S. at —— n. 16, 114 S.Ct. at 1429 n. 16.

Moreover, in applying *Duren* in *State v. Pollard*, 735 S.W.2d 345 (Mo. banc 1987), *cert. denied*, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 682 (1988), the Missouri Supreme Court specifically held that the trial court did not err in excusing women with small children at home who claimed that jury duty would create a hardship. The Court reasoned that "[t]here is no reason to believe that men responsible for the care of small children would not have been excused also." *Id.* at 348. In the instant case, there is similarly no reason to believe that men responsible for the care of small children—or for the care of others in their family who needed assistance—would not have been excused. A violation of equal protection has not been shown.

For all of these reasons, we affirm the conviction.

All concur.