Ann K. BULL, Respondent,

v.

Charles L. BULL, Appellant.

No. 43706.

Missouri Court of Appeals,
Eastern District,
Division Three.

May 4, 1982.

Michael J. McAvoy, St. Louis, for appellant.

Rene E. Lusser, St. Louis, for respondent.

REINHARD, Presiding Judge.

Husband appeals from several provisions of a dissolution decree dissolving the parties' marriage of 25 years. Pursuant to the decree, the wife was awarded her separate

property, and a smaller proportion of the marital property, including the family home. Husband was awarded the balance of the marital property, including a 60% interest in a very successful dental supply business, Challenge Products, Inc. Wife was awarded custody of the two minor children and husband was ordered to pay child support and $2,000.00 a month for maintenance.

On appeal, husband alleges error in: 1) the amount and duration of maintenance; 2) the award of the marital property; and 3) the temporary custody provisions for the youngest child.

■ The decree must be affirmed if it is supported by substantial evidence, is not against the weight of the evidence, and neither erroneously declares nor applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Using this standard, we find the trial court's decree must be affirmed.

■ First, we consider the award of temporary custody of the youngest child, Stephen. The trial court in its decree awarded wife permanent custody but awarded husband temporary custody of Stephen on alternate Saturdays from 8:00 a. m. to 8:00 p. m., alternate Holidays of Thanksgiving, Christmas Day, New Years Day, Fathers Day, Memorial Day, Fourth of July, and Labor Day, commencing with Christmas Day, 1980 from 8:00 a. m. to 8:00 p. m. Husband contends he should have been allowed custody of his son overnight.

Our paramount concern is the best interest of the child. The trial court's judgment in the matter of temporary custody should not be disturbed unless the best interests of the child so demand. *In re Marriage of Hallak*, 559 S.W.2d 612, 613 (Mo.App.1977). Further, we should give deference to the trial court's assessment of what serves the best interest of the child. *Hallak*, 559 S.W.2d at 613–14.

At the time of the hearing, Stephen was age 11. Husband was living in a substantial home on the Lake of the Ozarks with his secretary. Although the trial court made no specific finding, it is apparent the court refused to grant husband overnight custody of his son because a woman not his wife was residing in husband's home. Under these circumstances, we cannot second guess the trial court's determination this arrangement was in the best interests of the minor child.

■ In his second point, husband attacks the $2,000.00 a month award of maintenance. We are guided by several well established principles. First, the determination of the amount of maintenance is a matter resting within the sound discretion of the trial court and it is husband's burden on appeal to demonstrate an abuse of that discretion. *Naeger v. Naeger*, 542 S.W.2d 344, 347 (Mo.App.1976). Also, in determining the amount of maintenance the trial court must balance the reasonable needs of the spouse seeking maintenance against the husband's capacity to pay. *Sawtell v. Sawtell*, 569 S.W.2d 286, 288 (Mo.App.1978). A husband's present and past earnings are evidence of such capacity. *In re Marriage of Vanet*, 544 S.W.2d 236, 242 (Mo.App. 1976). To warrant appellate interference, the amount of maintenance must be patently unwarranted and wholly beyond the means of the spouse who pays maintenance. *Sawtell*, 569 S.W.2d at 288. Here, husband has not disputed that the reasonable needs of his wife merit $2,000.00 a month in maintenance, but does contend the award is excessive in light of his ability to pay.

With this in mind, we examine the record. The evidence revealed that husband had been very successful in the dental supply business for many years. He had been president of Credo, Inc., which was originally owned by his wife's father, but which at the time of trial was principally owned by his wife and her sister. In 1976, while still president of Credo, Inc., husband formed a new company, Challenge Products, Inc., also in the dental supply business. At the time of trial, he owned 55% of its stock, his wife owned 5% and the remainder was divided among his secretary and his two sons. As part of the decree, the trial court awarded wife's 5% interest to husband.

In September, 1979, shortly after separating from his wife, husband resigned as president of Credo, Inc. and devoted all of his energies to Challenge Products. All of Credo's employees and most of its customers followed husband to Challenge Products. Indeed, while with Credo, husband testified that he was "the business." This is evident because after he resigned, it ceased to be a going concern and had been liquidated at the time of trial.

In 1976, Credo, Inc. had sales of $180,000.00 and in the first nine months of 1979, had sales of $120,000.00. Challenge Products had sales of $3,000.00 in 1976; $57,000.00 in 1977; $212,000.00 in 1978; $443,000.00 in 1979; and $400,000.00 in the first nine months of 1980. Husband testified sales were doubling every year.

Husband testified that while operating Challenge Products, he was "doing business as Charles Bull." Among its assets, Challenge Products had $75,000.00 to $90,000.00 in inventory and equipment and owned a house with an equity of $60,000.00. Husband testified that he valued Challenge Products at $400,000.00 with his services included. On a loan application in 1978, he listed his income as $89,000.00 per year which included some income from income producing property awarded to wife as part of the decree.

He testified that his salary as president of Credo in 1979 was $45,000.00 per year, but stated Challenge paid him only $30,000.00 per year, even though it had sales at least four times that of Credo, Inc.

Wife also claimed that husband received cash payments from customers. On direct examination, husband was asked the following questions and gave the following responses:

Q. Have you in the past received cash payments from customers in lieu of being paid in check?

A. I refuse to answer that on the grounds that it may incriminate me.

Q. Mr. Bull, I specifically ask you with reference to a gentleman by the name of Aaron Mosley. Have you been paid in cash for products by Aaron Mosley?

A. I refuse to answer that on the grounds it may incriminate me.

Q. Mr. Bull, were there any other customers besides possibly Aaron Mosley that you received cash payments from in lieu of proper billing through your company?

A. I refuse to answer that on the grounds it may incriminate me.

■ The trial court in its findings of fact found that husband's income was supplemented by "unrecorded cash payments." We think this record supports such a finding.[1]

■ It is readily apparent that husband controls his salary at Challenge Products, Inc. Based upon his past income, the successful business which he was awarded in the decree and the unreported cash income, we conclude there was sufficient evidence in the record to establish his ability to pay the amount of maintenance awarded by the trial court. We rule this point against him.

Husband also asserts the trial court erred in not limiting the duration of the award of maintenance. In support of his argument, husband has cited a case wherein the trial court granted maintenance to a wife for a limited duration. In the light of the circumstances of this case, the trial court committed no error in not limiting the duration of maintenance.

Finally, husband makes several allegations of error concerning the distribution of the marital property. After reviewing the

1. It is well settled in Missouri that in a *civil* case a witness' refusal to answer pertinent questions may necessarily give rise to a strong inference against him that if he had given answers he would have corroborated the testimony others gave on the subject matter of the question. *Harwell v. Harwell,* 355 S.W.2d 137, 141 (Mo.App.1962). *See, Baxter v. Palmigiano,* 425 U.S. 308, 319, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976); and 98 C.J.S. *Witnesses,* § 455, p. 308.

entire record, though, we can find no error in the court's decree in this regard.

Affirmed.

SNYDER and CRIST, JJ., concur.