

# Missouri Court of Appeals

## Southern District

### Division One

J.C.M., an individual, and J.C.M., Next
Friend for W.C.M. and O.H.M.,

      Plaintiff-Appellant/Respondent,

v.

J.K.M., a/k/a J.K.E., D.A.N. and D.E.N.,

      Defendants-Respondents/Cross-
Appellants.

)
)
)
)
)
) Nos. SD35374, SD35375, and SD35376
)          (consolidated)
)
) **Filed: Apr. 16, 2019**
)
)
)

### APPEAL FROM THE CIRCUIT COURT OF IRON COUNTY

Honorable Randall Head

**AFFIRMED**

Every adult involved in this consolidated appeal challenges the judgment that

awarded money damages to W.C.M. ("WM") and O.H.M. ("OM") ("the children"). In a

single point, J.C.M. ("Father"), claims the trial court erred in failing to grant him a new

trial based upon his claim that the defendants' closing argument was "improper."[1]

J.K.M. ("Mother"), along with her parents, D.A.N. and D.E.N. ("Grandparents"), cross-

---

[1] For ease of reference we occasionally refer to Father and the children collectively as "Plaintiffs."

appeal the portion of the judgment entered in favor of Plaintiffs on their claims for interference with custodial rights and false imprisonment.[2]

In six points, Defendants claim the trial court erred in: (1) instructing the jury on the false imprisonment claim; (2) denying their motions for directed verdict or a new trial on the false imprisonment claim because Plaintiffs did not make a submissible case; and (3) abusing its discretion in ruling on four separate evidentiary matters.

Finally, Mother's sole additional point claims instructional error related to her refusal to answer questions at her deposition and subsequent failure to testify at trial based upon her assertion of Fifth-Amendment privilege. Finding no reversible error in any of these points, we affirm.

## Background

Mother and Father were married in 2000. The sad series of events that ultimately led to these appeals began in January 2006. At that time, Mother, Father, and the children were living together in apparent domestic harmony in Salem, Missouri. Sometime that month, WM, then four years' old, said that Father had touched his "root," the term WM used for his genitalia. Believing this statement to be an indication that Father had sexually abused WM, Mother took the children, moved out of the family home, and began residing in a trailer located on Grandparents' property in a remote part of Dent County, Missouri.

After Mother filed a petition for a child order of protection against him, Father filed for divorce in May 2006. After Mother and Father separated in 2006, and before the

---

[2] The briefs filed by Mother and Grandparents are identical in all respects, except that Mother's brief contains an additional allegation of error, Point 7 of her brief, that relates to her invocation of her Fifth Amendment right not to incriminate herself. To the extent that their arguments are the same, we analyze their points together and refer to Mother and Grandparents collectively as "Defendants."

dissolution trial in January 2008, various hotline calls were made against Father as a result of WM's accusations, and WM attended counseling. During this time period, WM made statements to several third-party witnesses, including professionals, non-professionals, and family members, about the alleged abuse. Due to the accusations against him, Father had only supervised visits with the children. The Children's Division investigated WM's accusations of sexual abuse and ultimately found them to be unsubstantiated. No criminal charges for sexual abuse were ever filed against Father.

When the dissolution judgment awarded custody of the children to Father, Mother abducted the children and fled the state.[3] Father would not see the children again for more than three years. When the children were finally returned to Missouri and placed back into Father's care and custody in August 2012, Father and the children sued Mother and Grandparents for, respectively, intentional interference with custody and false imprisonment.[4]

The dissolution case took three days to try, and the resulting **JUDGMENT, ORDER, AND DECREE OF DISSOLUTION OF MARRIAGE** ("the dissolution judgment") was extremely critical of Mother. For example, it contained the following findings:

- Mother had made no effort to seek employment;

- Mother had accused Father of having an affair with a co-worker during the marriage, but the court found no credible evidence of that – rather, it found that Mother had embarrassed and disrupted Father at his place of work;

- Mother had accused Father of having a pornography addiction, but the court was not convinced that Father's actions in that regard were abnormal;

---

[3] WM was born in 2002, and OM was born in 2004, making their respective ages seven and four at the time of their abduction.
[4] Father acted as the children's next friend in the proceedings. Their petition contained a third count for civil conspiracy, but Plaintiffs dismissed that theory of recovery prior to submitting the case to the jury.

- Mother's allegations of sexual abuse against Father were investigated by the Missouri Children's Division and were unsubstantiated;

- Mother repeatedly questioned WM about the sexual abuse, and that repeated questioning rendered any effort to obtain a reliable report nearly impossible;

- Mother had exerted pressure on the children not to attend visits with Father;

- Mother has an inflexible belief system that "prevents her from seeing the evidence of her mistake before her own eyes";

- There is no credible evidence that Father committed any acts of abuse;

- Mother and her family have a general attitude that they are right and therefore justified in violating court orders;

- Mother blames others for events that put her in a bad light;

- Mother has called the professionals involved in the case liars, and she exaggerates details or makes up stories in order to explain her position;

- Mother fabricates reasons to deny Father's family members contact with the children; and

- Because of her inflexible belief system, Mother will not comply with future court orders.

The dissolution judgment awarded Father legal and physical custody of the children, subject to periods of visitation with Mother. Because Mother had the children at the time the dissolution judgment was entered, the court ordered her to deliver them to Father in ten days -- May 31, 2009, at 5:00 p.m. at the Dent County Sheriff's Department. Father went to the sheriff's office at the appointed time and waited for over an hour, but Mother did not appear.

Unbeknownst to Father, instead of bringing them to the sheriff's office, Mother had taken the children to a home in Iowa owned by people known to Grandparents. Over the next three years, Mother moved the children from Iowa to North Carolina, Florida,

4

Texas, Oklahoma, Wyoming, and finally to Kansas, all the while evading the authorities' attempts to locate Mother and the children. During that three-year time period, the children were not allowed to attend school, were forced to disguise themselves by getting haircuts and coloring their hair, and were not allowed to have friends. Grandparents aided Mother in making these moves, either by providing her with money or by assisting her in finding places to live in those various states. The children were finally returned to Missouri in late August 2012 when law enforcement located them in Kansas.

When Mother returned to Missouri, she was charged with two felony counts of parental abduction. Those charges were eventually amended to misdemeanors, and Mother was placed on a two-year period of unsupervised probation, which she was still on at the time of trial.

Father's claims against Mother and Grandparents were for interference with his custodial rights based upon their abducting the children after the dissolution judgment had made Father their legal custodian. The theory of the children's false imprisonment claims against Mother and Grandparents was that they unlawfully restrained the children by removing them from the state against Father's wishes. Plaintiffs' petition alleged that the children "did not and, because of their minority, could not lawfully consent to this abduction."

The majority of the trial concerned whether Father had sexually abused WM. WM testified that he had no recollection of Father ever having abused him, and he did not remember ever having made such allegations against Father. Defendants contended that Mother was justified in taking the children, and Grandparents were justified in aiding and assisting her because they believed that Father had sexually abused WM.

5

Grandparents testified at trial. They admitted that they had taken the children in violation of a court order, but they argued that they were acting under a reasonable belief that Father had sexually abused WM, thus putting the children at risk while in Father's care. Mother asserted her Fifth-Amendment right against self-incrimination and did not testify at her deposition or at trial. The trial court later instructed the jury that "[i]n reaching a decision in this matter, you may but are not required to infer that had [Mother] responded truthfully to the questions posed to her during her deposition, her answers would have been unfavorable to her, or would have corroborated the testimony provided by Plaintiffs and their witnesses."

The jury returned a verdict in favor of Father and the children on all claims against Defendants. However, as to interference with Father's custodial rights ("Count 1"), the jury assessed Father's compensatory damages at "$0[.]" As to false imprisonment of WM ("Count 2"), the jury assessed WM's compensatory damages at $75,000. As to false imprisonment of OM ("Count 2"), the jury assessed OM's compensatory damages at $75,000. The jury also found that Plaintiffs were not entitled to punitive damages.

We recite additional evidence as necessary to address the parties' various points on appeal, and for ease of analysis, we do not take them up in strict numerical order.

## Analysis

### *Father's Direct Appeal*

Father's sole point claims as follows that the trial court erred in overruling his motion for a new trial based upon Defendants' allegedly "improper" jury argument.

> The trial court erred in overruling [Father]'s motion for a new trial based on Defendants' improper jury argument because Defendants' argument

was without legal or factual justification and was prejudicial in that Defendants "requested" that the jury transfer any damages it might award to [F]ather to [the children] because "we don't reward molest[e]rs" and the jury thereafter found [D]efendants liable for interference with [Father]'s custodial rights but awarded $0 in compensatory damages despite undisputed evidence that [F]ather incurred expenses related to his three-year search for his children in addition to non-pecuniary damages.

Father's point conflates two separate statements made during Defendants' closing arguments, and we will analyze them separately. First, Mother's counsel argued, "We don't reward child molesters. They aren't entitled to a dime, I don't care what they say; they're not entitled to it, and don't reward this man." Because Father did not object to that argument at trial, his claim is not preserved for review. *Potter v. Kley*, 411 S.W.3d 388, 391-92 (Mo. App. E.D. 2013).

> Unpreserved claims of error are subject only to review for plain error. [*Rush v. Senior Citizens Nursing Home Dist. of Ray County,* 212 S.W.3d 155, 162 (Mo. App. W.D. 2006).] Under Rule 84.13(c),[5] "[p]lain errors affecting substantial rights may be considered on appeal, in the discretion of the court, though not raised or preserved, when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Rule 84.13(c). Comments made during closing arguments rarely rise to the level of plain error entitling a party to relief. *Rush,* 212 S.W.3d at 163.

*Id.* at 392.

Father did not request plain-error review of this argument, and we decline to do so *sua sponte*. *See **Mitchell v. Wilson***, 496 S.W.3d 579, 584 n.5 (Mo. App. S.D. 2016).

Grandparents' counsel later argued:

> My clients have asked something, and I'm going to make that request to you, and that is this: That if you do decide to give anything more than nominal damages in this case, they have asked that you give it to the boys, rather than to [Father]. I'd rather have you have recovery for them.

---

[5] All rule references are to Missouri Court Rules (2018).

Father immediately objected that the argument was "utterly improper," and he requested a mistrial. The trial court denied the request for mistrial and advised the jury that it was to be guided by the court's instructions.

When the jury returned its verdict awarding Father "$0" in compensatory damages, Father stated:

> Prior to the discharge to discharging the [j]ury, I just want to renew my motion for a new [sic] trial[6] that I stated previously, [during defense counsel]'s improper argument to the jury in closing. I feel that it's clear now that that argument had a direct impact on the jury's verdict. As indicated by the verdict, I'd like to go renew that motion at this time.

The trial court again denied Father's request for a mistrial.

"A mistrial is a drastic remedy, granted only in extraordinary circumstances." *State ex rel. Kemper v. Vincent*, 191 S.W.3d 45, 49 (Mo. banc 2006) (quoting *State v. Parker*, 886 S.W.2d 908, 922 (Mo. banc 1994)). "Objections to evidence and argument must be specific." *State v. White*, 870 S.W.2d 869, 873 (Mo. App. W.D. 1993) (citing *State v. Jones*, 806 S.W.2d 702, 705 (Mo. App. E.D. 1991)). "The statement 'that's improper argument' is too general and nonspecific to preserve the issue for appellate review." *White*, 870 S.W.2d at 873 (citing *State v. Beatty*, 849 S.W.2d 56, 61 (Mo. App. W.D. 1993)). Thus, the trial court was free to simply deny or ignore it. *See Sparkman v. Columbia Mut. Ins. Co.*, 271 S.W.3d 619, 624 (Mo. App. S.D. 2008) ("A vague, general objection does not allow the trial court to make an informed ruling as to the validity of the objection").

---

[6] While counsel used the words "discharge" and "discharging" in stating that he wished to renew his "motion for a new trial[,]" this request was made before the jury had left the courtroom to begin its deliberations on the case. Based on that timing, we assume that counsel was actually referring to his earlier request for a mistrial.

"[W]e will not convict a trial court of error on an issue that it had no chance to decide." *Kline v. City of Kansas City*, 334 S.W.3d 632, 641 n.4 (Mo. App. W.D. 2011) (quoting *Goralnik v. United Fire & Cas. Co.*, 240 S.W.3d 203, 210 (Mo. App. E.D. 2007)). Father's point is denied.

### *Defendants' Cross-Appeal*

### *Review of Points Alleging Instructional Error*

> "An instruction will be given or refused by the trial court according to the law and the evidence in the case." *Eckerd v. Country Mut. Ins. Co.,* 289 S.W.3d 738, 746 (Mo.App.2009). "We review the evidence in the light most favorable to the submission of the instruction." *Id.* This Court reviews "the trial court's submission of a jury instruction ... de novo." *Rinehart v. Shelter Gen. Ins. Co.,* 261 S.W.3d 583, 593 (Mo.App.2008); *see Gumpanberger v. Jakob,* 241 S.W.3d 843, 846 (Mo.App.2007). "The court will determine if the instruction is supported by substantial evidence by viewing the evidence in a light most favorable to the instruction and disregard contrary evidence." *Syn, Inc. v. Beebe,* 200 S.W.3d 122, 128 (Mo.App.2006). A new trial is warranted "'only if the offending instruction misdirected, misled, or confused the jury, resulting in prejudicial error.'" *Rinehart,* 261 S.W.3d at 593 (quoting *Kopp v. Home Furnishing Ctr., LLC.,* 210 S.W.3d 319, 328 (Mo.App.2006)); *see McBryde v. Ritenour School Dist.,* 207 S.W.3d 162, 168 (Mo.App.2006). Stated another way, "[r]eversal for instructional error should not occur unless it is found that the instruction contains an error of substance with substantial potential for prejudicial effect." *White v. Curators of Univ. of Missouri,* 937 S.W.2d 366, 369 (Mo.App.1996).

*State ex rel. Missouri Highway & Transp. Comm'n v. Dale*, 309 S.W.3d 380, 384-85 (Mo. App. S.D. 2010).

### *Point 1 – Modification of False Imprisonment Verdict Director*

Defendants' first point claims the trial court erred in submitting a modified Missouri Approved Instruction ("MAI") on the children's false imprisonment claims because the instruction as submitted asked the jury to decide whether *Father* had

9

consented to the children being restrained by Mother -- not whether *the children* had consented to their restraint.

The approved MAI[7] for false imprisonment reads as follows:

Your verdict must be for plaintiff if you believe:

Defendant intentionally [restrained] [instigated the restraint of] plaintiff against plaintiff's will.

MAI 23.04 (footnote omitted).

In this case, the trial court submitted a modified version of MAI 23.04 that read:

Your verdict must be for plaintiff . . . if you believe:

Defendant . . . intentionally restrained, or aided or assisted in the restraint of, plaintiff . . . against the will of his legal custodian.

The jury received a total of six of these verdict directors (one for each child against each defendant).

Defendants claim the trial court erred in submitting these instructions because false imprisonment in Missouri requires that the individual be restrained against his or her own will and not that of a third party (here, the children's legal custodian). Defendants claim they were prejudiced by the modified instructions because no evidence was presented at trial that the children were restrained against their own wills.

Rule 70.02(e) provides for the modification of an existing MAI, the test for which is "whether it follows the substantive law and can be readily understood by the jury." ***Dale***, 309 S.W.3d at 385 (quoting ***Smith v. Kovac***, 927 S.W.2d 493, 497 (Mo. App. E.D. 1996)). The parties agree that MAI 23.04 was the best instruction from which to start,

---

[7] Unless otherwise indicated, all references to MAI are to the Seventh Edition (2012 & Supp. 2017).

10

but Defendants claim the trial court's modification was improper because it misstated substantive Missouri law.

Defendants argue that Missouri law does not make an exception for children or custodial parents, and the Restatement (Second) of Torts section 703 ("section 703") states that a child's consent bars a claim of false imprisonment. However, as Defendants concede, their research did not reveal any cases indicating that Missouri has adopted section 703, and our own research produced a similar result. Father, on the other hand, argues that infants and young children lack the information and maturity necessary to consent to unlawful conduct, and Missouri law recognizes this fact in numerous contexts. As no controlling Missouri authority seems to govern this particular dispute, we treat it as a question of first impression.

The children were ages seven and four when Mother absconded with them. The age at which a minor is considered competent to do any acts or perform any duties is determined by the legislature. *Morrissey v. Perry*, 137 U.S. 157, 159 (1890). While our legislature has not specifically addressed whether minors can consent to their taking and thereby preclude a finding of false imprisonment, it has designated various ages at which children can provide consent in other situations, and we first look to that evidence of legislative intent as informing our resolution of this point on appeal.

As Father points out in his brief, nowhere in its statutory scheme has the Missouri legislature indicated an intent to deem minors as young as the children to be capable of consenting to unlawful conduct. For example, Missouri has designated 14 as the age of consent for certain crimes committed against children, specifically kidnapping. *See* section 556.101.3(1) (stating that a person less than 14 years old is deemed incapable of

11

consent with respect to the crimes of kidnapping and child kidnapping).[8]  In analyzing whether a parent can be found guilty of kidnapping his own child, ***State v. Porter*** opined, "We think it is obvious that the General Assembly, like the drafters of the [Model Penal Code], understood that [] when the victim is a young child, the pertinent lack of consent is 'that of a parent or other appropriate person.'"  241 S.W.3d 385, 397 (Mo. App. W.D. 2007) (citing Model Penal Code, Explanatory Note for sections 212.1-212.5, 10A U.L.A. 421-22 (2001)).

With respect to kidnapping in the third degree, a defense exists "if the person restrained is a child under the age of seventeen <u>and</u>:  (1) [a] parent, guardian or other person responsible for the general supervision of the child's welfare has consented to the restraint[.]"  Section 565.140.1(1) (emphasis added).  *See also **Porter***, 241 S.W.3d at 396 (stating that because children under 14 cannot consent, a required element of traditional kidnapping is that the parent must remove the child from the lawful custody of another *without the permission of the lawful custodian*); ***State v. Vitiello***, 791 S.W.2d 837, 839 (Mo. App. W.D. 1990) (sufficient evidence to support kidnapping charges where father removed his illegitimate child from her mother without the mother's consent); section 556.061(5)(b) (stating that "[a]ssent does not constitute consent if . . . [i]t is given by a person who by reason of youth . . . is manifestly unable or known by the actor to be unable to make a reasonable judgment as to the nature or harmfulness of the conduct charged to constitute the offense").

In yet other areas of the law, Missouri has similarly designated ages beyond those at issue here as the age at which one can lawfully provide consent.  With a few minor

---

[8] Unless otherwise noted, all statutory citations are to RSMo 2000.  Section 556.101 was formerly section 565.100.1, but it was renumbered with no substantive changes.

exceptions, a child under the age of 18 may not legally consent to his or her own medical or surgical procedures.  *See* section 431.061.1(1), (2), (4)(a)-(c).  And custodial consent is necessary for those under age 18 who wish to marry.  Section 451.090.2.

Finally, other jurisdictions require false imprisonment claims involving minor children to be based upon the consent of the custodial parent -- not the child.  In ***R.J.D. v. Vaughan Clinic, P.C.***, 572 So.2d 1225 (Ala. 1990), the Supreme Court of Alabama held that a private physician and hospital could not be held liable for falsely imprisoning a minor child against her will when that imprisonment was based on the request and consent of the minor child's custodial parent.  ***Id.*** at 1229.  *See also* ***Commonwealth v. Nickerson***, 87 Mass. 518, 518-19 (Mass. 1862) (holding that a nine-year-old child is incapable of consenting to his forcible transfer from the legal custody of his father to the custody of his mother who had no right thereto); ***State v. Farrar***, 41 N.H. 53, 59 (N.H. 1860) (where divorce decree awarded mother custody of a four-year-old child that the father seized and carried out of the state, the child was incapable of consenting to that seizure).

"When an approved instruction does not fit the case precisely, modifications must be made."  ***Shutt v. Chris Kaye Plastics Corp.***, 962 S.W.2d 887, 890 (Mo. banc 1998) (citing MAI 5th, Committee Comment (1996 Revision) LIII)).  MAI itself directs that "[a] modification which is necessary to make a provided MAI fit the facts of your case [] is not only permissible but is required."  MAI "*How to Use This Book*," at LI.

Under the evidence adduced in this case, MAI 23.04 did not fit.  The challenged modifications were consistent with substantive Missouri law concerning the inability of

13

children to consent to actions taken by others, and they were necessary to fairly submit the issues to the jury given the children's ages.  Defendants' first point is denied.

*Point 7 – Instructing the Jury on Mother "Taking the Fifth"*

Mother's separate point claims:

> The trial court erred in allowing Plaintiffs to enter into evidence proof that [Mother] refused to answer questions at her deposition based on the Fifth Amendment **and** in submitting Plaintiff[s'] instruction No. 40 regarding the inferences the jury could draw from [Mother's] exercise of those rights, because it was an improper inference and the instruction was prejudicial to [Mother], in that there was ample evidence that the so-called presumption was not true in this case and the instruction was an incorrect and unnecessary statement of the law which improperly called attention to her failure to testify by invoking her Fifth Amendment rights.  (Emphasis added.)[9]

As a result of her absconding with the children, Mother was charged with two counts of felony child abduction, both of which were still pending during the discovery phase of this case.  On March 30, 2016, while the felony charges were still pending, Mother appeared for her deposition in this case.  After stating her name and address, Mother provided the following answer to each question posed to her:

> My lawyer has advised me not to answer questions about anything pertaining to this case.  Following his advice and pursuant to the Fifth Amendment to the United States Constitution and Article I, Section 19 of the Missouri Constitution, I will not answer any questions.

During *voir dire*, Mother's attorney disclosed that Mother had originally been charged with two counts of felony parental abduction, and those felony charges were still pending at the time of her deposition.  Mother's attorney also informed the panel that those charges had recently been amended to misdemeanors, and Mother had "entered a

---

[9] Mother's point, which includes more than one alleged error – admitting the deposition **and** giving a jury instruction – is multifarious and preserves nothing for our review. *City of Joplin v. Wallace Bajjali Dev. Partners, L.P.*, 522 S.W.3d 327, 330 (Mo. App. S.D. 2017).  However, we exercise our discretion to review the challenge to the jury instruction *ex gratia*. *Id.* at 331.

particular type of disposition [] which you may or may not hear details about which resulted in her not getting a conviction, not admitting that she did anything wrong[.]" Her attorney stated that "because of where we were at the time when this lawsuit was -- civil lawsuit was filed, she took the Fifth Amendment and did not testify, and rules now prevent her from testifying in this court." Counsel then asked: "is there anybody that's going to hold that against her for exercising her constitutional rights under the Fifth Amendment?" No panelist raised his or her hand in response to that question.

At trial, Father's counsel introduced the portion of Mother's deposition transcript in which she asserted her Fifth-Amendment right not to testify. Counsel did not actually read that portion of the deposition to the jury after it was received into evidence.

During the conference on jury instructions, Father's counsel stated:

[O]ne of the instructions that Plaintiffs have requested is an instruction clarifying the inference to be drawn from [Mother]'s taking of the Fifth. There was some discussion in voir dire about suggesting to the jurors that they would not or could not hold that against her, and we do not believe that's an accurate--we believe that would be to be [sic] a misstatement of Missouri law and are requesting a clarifying instruction to clarify that they can, in fact, draw negative inferences and that if she had testified, her testimony would not have been favorable to her.

Mother objected to the instruction on the ground that it was a misstatement of Missouri law. Father contended that the instruction was a necessary clarifying instruction because "the jury was specifically advised in voir dire in a way that [counsel] believe[d] may have suggested that they could not or should not draw an inference[.]"

The trial court overruled Mother's objection to the instruction ("Instruction No. 40"), and it was included in the package of instructions read and given to the jury. As earlier noted, it read as follows:

15

In reaching a decision in this matter, you may but are not required to infer that had [Mother] responded truthfully to the questions posed to her during her deposition, her answers would have been unfavorable to her, or would have corroborated the testimony provided by Plaintiffs and their witnesses.

In support of her claim that Instruction No. 40 was "an improper inference[,]" Mother relies on *Johnson v. Missouri Bd. of Nursing Adm'rs*, 130 S.W.3d 619 (Mo. App. W.D. 2004), in arguing that the trial court erred in giving Instruction No. 40 because "there is absolutely nothing to suggest that [Mother]'s answers would be unfavorable to her" and her answer to the petition, as well as Grandparents' testimony, cures any doubt about the same.[10]

Mother appears to argue that the trial court treated her claim of privilege as a conclusive judicial admission to the truth of Plaintiffs' claims. That argument ignores the instruction's language that the jury "may[,]" but is "not required to[,]" infer the negative inference from Mother's failure to testify. The inference is thus permissive, and "[a] party seeking the benefit of a negative Fifth Amendment inference in a civil case must[] make an affirmative showing to support its right to judgment and cannot rely exclusively upon the other party's refusal to testify." *Id.* at 632. Mother does not assert that Plaintiffs failed to offer affirmative proof in support of their claims.

*Johnson* observed that the Fifth Amendment privilege against self-incrimination is properly asserted by parties in civil proceedings during discovery and at trial. *Id.* at 628. Although the normal rule in a *criminal* case is that no negative inference may be drawn from the defendant's failure to testify, "civil claimants have been denied certain

---

[10] Though *Johnson* is an administrative case, the analysis of the effect of "taking the Fifth" applies equally to the civil proceedings in this case as *Johnson* noted that "the law of privilege fully applies to administrative proceedings, which are considered, for this limited purpose, just as if they were ordinary civil actions." *Id.* at 627-28.

benefits and exposed to negative consequences as a result of having invoked the privilege." *Id.* (quoting *In re Moses*, 792 F.Supp. 529, 536 (E.D. Mich. 1992)). *Johnson*, relying on Missouri cases, stated that the refusal to answer pertinent questions on Fifth Amendment grounds justified a permissive inference that: "(a) if she had answered truthfully, the answers would have been unfavorable to her; or (b) would have corroborated testimony given by the opposing side's witnesses on the subject matter of the questions[.]" *Id.* at 631 (internal citations omitted). *See also Lappe & Assocs., Inc. v. Palmen*, 811 S.W.2d 468, 471 (Mo. App. E.D. 1991); *Bull v. Bull*, 634 S.W.2d 228, 230 n.1 (Mo. App. E.D. 1982).

As a result, Mother's claim on appeal that Instruction Number 40 should not have been given because "it was an improper inference" fails.[11]  Point 7 is denied.

*Point 2 – Submissibility*

Defendants' second point claims (*in toto*):

> The trial court erred in denying Defendants' motions for a directed verdict and new trial regarding Plaintiffs' false imprisonment count because Plaintiffs did not make a submissible case in that the evidence demonstrated that [the children] were never restrained against their will.

For the reasons stated in our analysis of the substantive law at issue in resolving Defendants' challenge on this same basis to the modified MAI instruction given by the

---

[11] Mother did not object on the ground that giving an adverse inference instruction to the jury is improper under any circumstances.  Father argues that Instruction No. 40 was a proper clarifying instruction in response to Mother's misstatement of the law to the jury during *voir dire*.  Because of the narrow basis of Mother's objection, we need not determine whether a misstatement of the law during *voir dire* would justify the use of an adverse-inference instruction.  In general, a trial court should refuse such a request. *See Marmaduke v. CBL & Assocs. Mgmt., Inc.*, 521 S.W.3d 257, 270 (Mo. App. E.D. 2017); *Berger v. Copeland Corp., LLC*, 505 S.W.3d 337, 338-39 (Mo. App. S.D. 2016).  "The prohibition against such an instruction is based upon the principle that the trial court should not comment on the evidence." *Berger*, 505 S.W.3d at 339 (citing *Hartman v. Hartman*, 284 S.W. 488, 489 (Mo. banc 1926)). *See also Pisoni v. Steak 'N Shake Operations, Inc.*, 468 S.W.3d 922, 928 (Mo. App. E.D. 2015) (While a party may argue the adverse inference to the jury, the party is not entitled to a jury instruction addressing the issue).

trial court, Point 2 also fails.[12]

### Points 3–6:  Standard of Review

Defendants' points three through six claim the trial court abused its discretion in either admitting or refusing to admit certain evidence.  While we address the law applicable to each point as necessary, all four are subject to the following standard of review.

> "The admissibility of evidence lies within the sound discretion of the trial court and will not be disturbed absent abuse of discretion." *Nelson v. Waxman,* 9 S.W.3d 601, 603 (Mo. banc 2000).  This standard gives the trial court "broad leeway in choosing to admit evidence," and its exercise of discretion will not be disturbed unless it "'is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration.'"  *State v. Freeman,* 269 S.W.3d 422, 426-27 (Mo. banc 2008), *quoting, State v. Forrest,* 183 S.W.3d 218, 223 (Mo. banc 2006).  In part, such broad leeway is granted to ensure the probative value of admitted evidence outweighs any unfair prejudice.  *Freeman,* 269 S.W.3d at 427, *quoting, State v. Anderson,* 76 S.W.3d 275, 276 (Mo. banc 2002).  "For evidentiary error to cause reversal, prejudice must be demonstrated."  *State v. Reed,* 282 S.W.3d 835, 837 (Mo. banc 2009).

***Mitchell v. Kardesch***, 313 S.W.3d 667, 674-75 (Mo. banc 2010).

### Point 3 – The Dissolution Judgments

Point 3 claims:

> The trial court erred in admitting detailed dissolution orders from a previous case into evidence and in allowing them to be read by the jury, because they were unfairly prejudicial and consisted of or at least

---

[12] The argument following Point 2 also claimed that "there was no false imprisonment because there was [no] evidence at trial of any restraint."  Because this claim is not contained in the point relied on, we do not address it.  ***C.S. v. Missouri Dep't of Soc. Servs.***, 491 S.W.3d 636, 656 (Mo. App. W.D. 2016)  Even if it had been included, the uncontested testimony at trial was that the children – far too young to drive – were shuttled between homes and apartments in various states by Mother, Grandparents, and Grandparents' friends.  The children did not know where they were or why they were there, and they had few personal belongings.  They were often taken to remote and isolated areas far from any town.  WM testified that their family did not have a car, and the children were not free to go outside and walk around or do things on their own.  During their time on the run, the children did not attend school or have friends, and they were made to disguise themselves and use false names in order to evade the authorities Defendants knew were looking for them.  A reasonable juror could find from this evidence that resistance or attempted flight by the children would have been futile, and they were not free to leave the various circumstances in which they found themselves.

contained impermissible hearsay, in that the orders contained detailed and disparaging factual findings about [D]efendants and recited specific hearsay testimony of third parties such as Plaintiff[s'] expert witness in the dissolution case.

The referenced evidence was received as exhibits 4 and 5, respectively, the dissolution judgment and the **AMENDED JUDGMENT, ORDER, AND DECREE OF DISSOLUTION OF MARRIAGE**.[13]  Those judgments, as previously noted, were highly critical of Mother and Grandparents.

Defendants rely heavily upon ***Gamble v. Browning***, 379 S.W.3d 194 (Mo. App. W.D. 2012), in arguing that "the consensus among courts is to exclude judicial opinions because of the risk of undue prejudice." ***Id.*** at 203.  Defendants acknowledge, however, that ***Gamble*** starts from the premise that "when the record in another case forms an essential element of a party's claim or defense, the record itself must be introduced in evidence, absent an admission of its contents by the opposing party." ***Id.*** at 201 (quoting ***Chandler v. Hemeyer***, 49 S.W.3d 786, 791-92 (Mo. App. W.D. 2001)).  Further, the judge's order at issue in ***Gamble*** "applied legal concepts and standards inapplicable" to the case being tried.  379 S.W.3d at 202.

Despite that acknowledgement and distinction, Defendants argue that the dissolution judgments were not admissible here as Defendants were willing to stipulate that their conduct violated the legal effect of the order in the dissolution judgment that gave Father custody of the children.  Defendants argue that it was overly prejudicial to admit the dissolution judgment in its entirety because it "berat[es]" Mother and casts aspersions on Mother and Grandparents for violating court orders.  Defendants also

---

[13] The **AMENDED JUDGMENT, ORDER, AND DECREE OF DISSOLUTION OF MARRIAGE** was entered after Mother took the children and it awarded Father sole physical and sole legal custody with no visitation for Mother.

object to the admission of the dissolution judgment because it recites hearsay testimony, such as that of Dr. Ann Duncan ("Dr. Duncan"), who predicted that Mother would "cut off and reject anyone not taking her side[.]"

It is well-established that a trial court may take judicial notice of the relevant records and files of other proceedings. *Manz v. Manz*, 805 S.W.2d 183, 185 (Mo. App. E.D. 1990) (court in dissolution action may take judicial notice of evidence adduced in previous adult abuse proceeding); *Hoekstra v. Jenkins*, 730 S.W.2d 263, 267 (Mo. App. E.D. 1987) (trial judge in civil wrongful death action properly noticed record in criminal case involving decedent). In fact, our high court has even contemplated that findings in a divorce decree might be used as evidence of spousal misconduct in a later tort proceeding between the parties. In its opinion abolishing inter-spousal immunity for negligence actions, *S.A.V. v. K.G.V.*, 708 S.W.2d 651 (Mo. banc 1986), the Court noted that

> to the extent that conduct of the spouses is taken into account in division of marital property [. . .], the dissolution decree might be admissible in the subsequent tort action subject to usual constraints of relevance, competence and with a careful eye to questions of causation and speculativeness of damages. The same may hold true for the dissolution proceeding if that action follows trial of the tort claim.

*Id.* at 653.

Regarding relevancy determinations, Defendants admit that the dissolution judgment was certainly logically relevant to the issues at trial. While Defendants argue that the dissolution judgment was only relevant in regard to the legal effect of the custody order, *i.e.* that it awarded Father custody of the children, they fail to recognize that the dissolution judgment was also relevant to Defendants' justification defense.

Defendants claimed they were justified in absconding with the children for three years based upon their sincere belief that Father had molested WM. However, as Father

20

points out, Defendants' justification defense would be measured by an objective standard -- the belief of a reasonable person under similar circumstances at the time Mother absconded with the children. *See* **Cohen v. Metropolitan Life Ins. Co.**, 444 S.W.2d 498, 506 (Mo. App. St.L.D. 1969) (in a vexatious refusal case, the insurer must have knowledge of facts supporting its defenses at the time it should have paid – it cannot rely on potentially favorable facts that might be discovered later).[14]  Defendants were familiar with the contents of the dissolution judgment and would have known at the time of the abduction that the trial judge in that case ("the dissolution court") had concluded that there was no credible evidence to support Mother's sexual abuse allegations.  The jury could rightly consider this information in deciding whether Defendants' actions were reasonable at the time they were taken.

Defendants note in their brief that "[m]ost of the dissolution [judgment] consists of factual findings . . . that inform [the dissolution court]'s decision to give custody to [Father]."  Like the trial in this case, the dissolution trial appears to have focused heavily upon whether Father had abused WM.  The factual findings contained in the dissolution judgment constituted probative evidence of whether Defendants' beliefs were reasonable.

Further, many of the factual findings contained in the dissolution judgment about which Defendants complain were already before the jury.  Dr. Duncan's prediction that Mother would cut off and reject anyone not taking her side was precisely what Mother actually did after the dissolution court issued its judgment, and Mother absconded with the children for a period of three years.  The dissolution court awarded custody to Father in part because it was "convinced" that Mother would not comply with court orders in the

---

[14] Counsel for Defendants agreed during oral argument that an objective standard applied to Defendants' justification defense.

21

future and would "refuse any effort to allow [Father] to see his children"; predictions that were followed by those very actions. Prejudicial error does not exist when the complained-of evidence was cumulative to other properly-admitted evidence. *Martin v. Mercy Hosp. Springfield*, 516 S.W.3d 403, 406 (Mo. App. S.D. 2017).

In summation, Defendants have failed to cite any authority for their claim that the trial court abused its discretion in receiving into evidence relevant prior judgments such as those at issue here, and we are unaware of any such authority. Point 3 is denied.

*Point 4 – Dr. Duncan's Written Report*

Point 4 claims the trial court erred in admitting into evidence the written report of Dr. Duncan (an expert in child psychology) and allowing the jury to read it because the report was prejudicial in that it contained disparaging statements about Defendants as well as hearsay.[15]

Dr. Duncan became involved with the parties when the dissolution court appointed her to perform "a fairly thorough evaluation of [Mother]" to assess her ability to co-parent, any mental condition that she might have, her ability to perceive and report information, and any personality traits or other disorders that she might have. When Father volunteered to be similarly evaluated, Dr. Duncan performed that evaluation as well. She concluded from her evaluations that Father was an appropriate and sturdy parent, that Mother would have difficulties co-parenting, and that if Father were awarded custody, Mother would have difficulties complying with the court's order.

Dr. Duncan was not involved with the parties again until August 2012, when the children were returned from Kansas. At that point, Dr. Duncan was asked to help Father

---

[15] As Father notes, Defendants did not object to Dr. Duncan's live testimony about the conclusions in her report. They only dispute the admission of her written report and its eventual publication to the jury.

22

and the children transition back into a "normal" life together. She also performed educational testing to support recommendations about the grade levels into which the children should be placed. Dr. Duncan also prepared a report setting forth her psychological assessments of the children as of March 2017. Dr. Duncan described her written report as "set[ting] forth the nature of the investigation and the opinions [she] reached in this case[.]"

During her direct examination, Dr. Duncan testified that based upon her extensive testing and interviews with the children, in her 50 years of working with traumatized children, WM and OM were "badly traumatized in so many different ways[.]" She believed that both boys qualified for a diagnosis of post-traumatic stress disorder. OM also had a secondary diagnosis of adjustment reaction with mixed features, and WM a secondary diagnosis of anxiety disorder.

During her direct testimony, Plaintiffs sought to introduce the written report as Exhibit No. 7. Defendants objected to its admission on the ground that it was inappropriate to admit the report of a testifying witness and it contained inadmissible information, including hearsay. Defendants stated that they had "no problem" with Dr. Duncan "referring to the report and testifying to [its] conclusions[,]" but they argued that if the report went to the jury, it would "substitute for potential testimony." Plaintiffs contended that they were "trying to avoid having to read 21 pages of her report into the record[.]" When the trial court asked Plaintiffs if they intended to ask permission to publish the report to the jury, they answered "I don't anticipate it at this time, Judge. I may refer to pieces of it in closing argument. That's what [sic] why I want to admit it, so at least I can argue those issues without having to have it all read in." The trial court

23

overruled Defendants' objections and received the report into evidence. Father did not ask to publish the report to the jury until Plaintiffs presented rebuttal evidence in the case.[16]

During their case-in-chief, Defendants presented testimony from their own expert, Dr. Rosalyn Schultz ("Dr. Schultz"), a licensed psychologist. Dr. Schultz did not interview the children. The only opinion testimony Dr. Schultz provided at trial was a critique of Dr. Duncan's report and the methodologies she had used. She merely opined that "all of Dr. Duncan's work[] does not indicate that there is sufficient evidence that the[] children were harmed." Dr. Schultz referred to and testified about Dr. Duncan's report extensively, and she generally opined that Dr. Duncan's report lacked credibility, and her findings, including her post-traumatic stress diagnoses, were unfounded and were actually contradicted by the testing Dr. Duncan had performed. It was not until after Dr. Schultz had critiqued Dr. Duncan's report that Plaintiffs asked to publish it to each member of the jury.

Defendants concede that much of the report is based upon statements made by the parties, all of whom were at trial, and -- with the exception of Mother -- were available for cross-examination. But Defendants complain about other specific portions of the report, namely: (1) Dr. Duncan's reliance on unidentified hearsay to "pass judgment" on Defendants and undermine their credibility, including a history of being arrested at abortion clinic protests, and a "cult-like dedication to personal beliefs"; and (2) Dr. Duncan's statement that Defendants planned the abduction in advance.

---

[16] The admission of Dr. Duncan's report was of no consequence until it was seen by the jury. *Davolt v. Highland*, 119 S.W.3d 118, 132-35 (Mo. App. W.D. 2003).

24

A review of the transcript reveals that the allegedly irrelevant and prejudicial portions of the report about which Defendants complain were actually raised by Defendants during their cross-examination of Dr. Duncan. "Missouri law is settled that a party may not complain about evidence introduced into the case through his attorney's questions or conduct." *State v. Eighinger*, 931 S.W.2d 835, 838 (Mo. App. W.D. 1996).

The general tenor of Defendants' cross-examination was to portray Dr. Duncan as a biased witness who believed Mother and Grandparents were cult-like fanatics wedded to their extreme beliefs. Defense counsel cross-examined Dr. Duncan about the references in her report to D.E.N., who had protested with Mother's sister outside of abortion clinics. Defense counsel asked Dr. Duncan at length about her indication that Mother's family had an emotional theme running through it that "men will betray your trust." He questioned her about D.A.N.'s affair and D.E.N.'s taking Mother out of state as a young child because of it. Defense counsel also questioned Dr. Duncan about her statement that Mother's "only safety is in religion."

Dr. Schultz's testimony again put Dr. Duncan's report at issue when she opined on the illegitimacy of the report and critiqued and undermined all of Dr. Duncan's methodologies and diagnoses. It was not until after Defendants had presented all of this evidence that Plaintiffs asked for and received permission to publish the report to the jury.

Defendants put the contents of Dr. Duncan's report at issue with both Dr. Schultz's testimony and with their own cross-examination of Dr. Duncan. Under these circumstances, we conclude that the trial court's decision to allow Plaintiffs to publish the report to the jury was not so "clearly against the logic of the circumstances and is so

25

unreasonable as to indicate a lack of careful consideration." *Forrest*, 183 S.W.3d at 223 (quoting *State v. Gonzales*, 153 S.W.3d 311, 312 (Mo. banc 2005)); *Eckerd v. Country Mut. Ins. Co.*, 289 S.W.3d 738, 744 (Mo. App. E.D. 2009) (quoting *Bowls v. Scarborough*, 950 S.W.2d 691, 702 (Mo. App. W.D. 1997) ("[a] party who has introduced evidence concerning a certain fact may not on appeal complain that his opponent was allowed to introduce related evidence, in rebuttal or explanation")).

Point 4 is denied.

*Point 5 – WM's Out-of-Court Statements*

Point 5 claims:

The trial court erred in refusing to allow Defendants to offer evidence of certain of [WM]'s statements regarding sexual abuse by [F]ather and in refusing to allow him to be cross-examined regarding those statements, because those statements were party admissions and prior inconsistent statements and upon which Defendants should have been allowed to cross-examine, in that [WM]'s testimony at trial was that he had never been abused by [F]ather and he did not remember making the statements.

We disagree.

"The trial court has sound discretion with respect to the admissibility of evidence and over the extent and scope of cross-examination in civil actions." *Dieser v. St. Anthony's Med. Ctr.*, 498 S.W.3d 419, 434 (Mo. banc 2016). "[W]e will not reverse a judgment unless we find that an error 'materially affected the merits of the action[,]'" meaning the improper admission or exclusion of evidence was outcome-determinative. *Reed v. Kansas City Mo. Sch. Dist.*, 504 S.W.3d 235, 240 (Mo. App. W.D. 2016) (internal citations omitted).

Defendants assert that WM made statements to professionals and non-professionals, family members and non-family members, the content of which varied, but

26

in general included: "[t]hat [F]ather touched his 'root,' or penis; [t]hat [F]ather was a bad man who hurt him; [t]hat he did not want to see or be around [F]ather"; and that "[F]ather had touched [WM's] penis and buttocks inappropriately." Defendants argue that the specific statements made to Children's Division investigators were "particularly important because they were made to completely independent parties." Defendants do not argue how they were prejudiced by their exclusion, other than to say that it was "extremely prejudicial" for the trial court to deny cross-examination on those specific statements.

The following exchange that occurred between WM and his lawyer at trial is relevant to the resolution of this point.

[Counsel:]    Did your mom ever give you any reasons for why she was hiding from your dad?

[WM:]    Yes.

[Counsel:]    And what was that?

[WM:]    That she didn't want us to be with him because of she said that I told her that he abused me.

[Counsel:]    Okay, and you understand that there's going to be testimony in this case--well, that you told a variety of stories--

[WM:]    Yes.

[Counsel:]    --about--let me finish my question. You understand there's going to be testimony in this case that you told a variety of stories about bad acts of your dad, beginning back in 2005 or 2006?

[WM:]    Yes.

[Counsel:]    Do you remember any--telling anybody those--do you specifically remember telling me these stories?

27

[WM:]       No.

[Counsel:]  How [old] would you have been in 2005-2006?

[WM:]       Um, three.

[Counsel:]  You turned four sometime in 2006?

[WM:]       Yes.

[Counsel:]  That would have been about twelve years ago?

[WM:]       Yes.

[Counsel:]  Now, before preparing for your testimony today, preparing the testimony to come to court, did you have a recollection of ever making those specific statements?

[WM:]       No.

[Counsel:]  In preparing for court, did you go back and look at some of the records from back in 2006?

[WM:]       Yes.

[Counsel:]  As you sit here today, are you denying that you may have told those stories to people?

[WM:]       No.

[Counsel:]  You are not denying that you might have told someone that your dad shot a woman in the woods?

[WM:]       No.

[Counsel:]  Or that he touched your penis?

[WM:]       No.

[Counsel:]  Or that he watched child pornography with his sister in the room?

[WM:]       No.

[Counsel:]  Did any of those happen?

28

[WM:]        No.

On cross-examination, defense counsel began to question WM about the content of specific statements he had made to third parties about what Father had allegedly done to him. WM maintained that he had no recollection of making those statements. When defense counsel began to question WM about a specific statement he made in January 2006, WM's attorney objected that the questioning violated the court's ruling on a motion *in limine*. Defendants argued that, because WM had said he did not remember making the statements, they were allowed to "test his recollection" and that the statements went to bias and prejudice. The trial court sustained the objection and refused to allow any questioning about specific statements that WM had allegedly made to third parties.

Defense counsel then questioned WM about the alleged abuse in general -- asking him whether he remembered speaking with certain individuals about the abuse and whether he remembered telling them "that my dad had touched me and stuff like that." WM again insisted that he had no recollection of the abuse or of making any statements about it, but he did say that he did not know why he would lie about it, other than the fact that he "was so little at that age that [he] had no idea if it was a lie or what it was because [he didn't] even remember."

Defendants have failed to establish that the trial court's ruling on the permissible scope of cross-examination of WM resulted in reversible error. "An erroneous evidentiary ruling warrants reversal ... only when it affects the result or the outcome of the case[.]" **Dieser**, 498 S.W.3d at 435 (internal citation omitted). "The exclusion of cumulative evidence is not considered prejudicial on appeal." **Adkins v. Hontz**, 337 S.W.3d 711, 720 (Mo. App. W.D. 2011). In this case, the jury heard time and again that

29

WM had made previous accusations to "a number of different people" that Father had sexually abused him. The jury heard evidence that WM had alleged that Father had touched WM's "root," had forced WM to put Father's "root" in his hands, that Father had put WM's "root" in Father's mouth, that Father had touched and hurt WM's buttocks, and that Father had put his root in WM's buttocks. The jury also heard that WM had accused Father of watching child pornography with Father's sister.

Thus, the jury heard extensive testimony on WM's allegations of abuse against Father and specific details of what Father had allegedly done. The jury knew that WM had made these allegations to state investigators and family members alike, and counsel for Defendants referenced them in closing arguments. Therefore, the exclusion of WM's specific statements to specific individuals would have been cumulative to evidence already in the case, and its exclusion could not have been outcome-determinative. ***Id.*** Point 5 is denied.

*Point 6 – Testimony by the Guardian* ad Litem *("GAL")*

Defendants' sixth point claims:

> The trial court erred in allowing the [GAL] from the dissolution case to testify as to her opinion on whether or not sexual abuse had occurred **and** in disallowing defense counsel to cross-examine her regarding documents she utilized to formulate her opinions, because her testimony was prejudicial and impermissible lay witness testimony, in that her opinions invaded the province of the jury and defense counsel were denied their right to cross-examine her regarding documents upon which she based her opinions. (Emphasis added.)[17]

During his case-in-chief, Father called the GAL in the parties' dissolution case, Katie Anderson. The point of Ms. Anderson's testimony was to give the jury her opinion

---

[17] Defendants' point, which includes more than one issue, is multifarious and preserves nothing for our review. ***City of Joplin***, 522 S.W.3d at 330. However, we exercise our discretion to review Defendants' point *ex gratia*. ***Id.*** at 331.

that Father had not sexually abused WM. Prior to her testimony, Defendants objected on the basis that: (1) Ms. Anderson may testify to evidence which had been excluded under the previous motions *in limine*, such as interviews with the Children's Division; and (2) "calling her is something like an expert witness . . . but it isn't an expert witness that this court needs or this jury should have." Plaintiffs responded that they were only offering Ms. Anderson's testimony to show the reasonableness (or lack thereof) of Defendants' actions in taking the children, and they did not intend to cover any evidence that had been excluded by the trial court's ruling on the motion *in limine*. The trial court allowed Ms. Anderson's testimony, subject to that limitation.

Ms. Anderson testified that, as part of her role in the dissolution case, she interviewed Mother and Father and reviewed all the documents they gave her. She also investigated concerns about abuse or neglect and reported her findings to the dissolution court. Ms. Anderson testified that her recommendations to the dissolution court were as follows.

> So my report to the court included that I did not feel that WM had been sexually abused. I made a recommendation to the court that included proposals if the court did find that sexual abuse [had] occurred. . . . and then I made a second alternative recommendation in the event that the court agreed with my report and also concluded that there was no sexual abuse.

Ms. Anderson's direct testimony consumed only six pages of trial transcript.

After her direct examination was completed, Defendants argued that Ms. Anderson had testified about her opinion, and Defendants should be allowed to question her about the bases for that opinion, including the contents of specific documents that she had reviewed, some of which contained the statements of abuse that WM had made to third parties. Father's counsel responded that the bases for the GAL's opinion were

31

irrelevant because her opinion was only relevant to the extent that it shed light on what Defendants knew at the time they took the children, thus shedding light on whether Defendants' belief that WM had been sexually abused was reasonable.

The trial court believed that the documents Ms. Anderson relied upon in reaching her opinion were covered by the previous motion *in limine*, and it refused to allow Ms. Anderson to be questioned about them. The trial court did, however, allow Defendants to question Ms. Anderson about which documents she had reviewed in forming her opinions; it only barred questions about specific statements contained in those documents. Ms. Anderson testified that she had reviewed, among other documents, Children's Division records, including progress notes and interviews its employees had conducted.

To obtain a reversal under this point, Defendants must demonstrate that they were prejudiced by the admission of Ms. Anderson's testimony. ***Babb v. Pfuehler***, 944 S.W.2d 331, 336 (Mo. App. S.D. 1997). As in Point 5, Defendants' inability to do so is fatal to their claim. The jury heard from several sources that WM's allegations of abuse against Father had been unsubstantiated by the relevant authorities, and they were told as early as opening statements that "DFS [a previous acronym for what is now the Children's Division] eventually unsubstantiated the case." Most importantly, the jury was aware that Father had been given custody of the children in the divorce – leading to a reasonable inference that the dissolution court had not found Father to be an abuser.

As earlier noted, the jury also saw the dissolution judgment itself, which contained an explicit factual finding that "no credible evidence that any act of abuse by [Father had] occurred." The dissolution judgment also recounted that the allegations of

32

sexual abuse had been investigated by the Children's Division and were found to be unsubstantiated. Finally, Dr. Duncan testified that her testing revealed that Father was "appropriate, sturdy emotionally. . . . There was [sic] no warning signs that he was a pedophile, or a pervert, or a pornography addict, or had a personality disorder."

Regarding Defendants' inability to cross-examine Ms. Anderson on the specifics of the documents she reviewed, that complaint fails for the same reasons we articulated in our analysis of Point 5. The jury already knew many specifics about WM's allegations of abuse, along with the fact that they had been investigated and documented by the relevant authorities. And the trial court allowed Defendants to ask Ms. Anderson whether she had reviewed those documents.

Defendants also effectively cast doubt upon Ms. Anderson's opinions by eliciting admissions from her on cross-examination that: (1) she wrestled with the decision of whether any sexual abuse had occurred; (2) there were two sides to the story; and (3) she could not say for certain that no sexual abuse had occurred. Again, Defendants have failed to show that the trial court's limitation on the questions Defendants could ask the GAL was outcome-determinative in this case.

Defendants' sixth point is also denied, and the judgment of the trial court is affirmed.

DON E. BURRELL, P.J. – OPINION AUTHOR

NANCY STEFFEN RAHMEYER, J. – CONCURS

GARY W. LYNCH, J. – CONCURS

33